78 So.2d 26 (1955)
Mrs. Lois Weaver MARLER, Plaintiff-Appellee.
v.
STATE of Louisiana, Defendant-Appellant.
No. 8234.
Court of Appeal of Louisiana, Second Circuit.
January 31, 1955.
Rehearing Denied March 8, 1955.
Writ of Certiorari Denied April 25, 1955.
*27 Fred S. LeBlanc, Atty. Gen., W. D. Atkins, Asst. Atty. Gen., for appellant.
*28 Gravel & Downs, McSween & McSween, Alexandria, for appellee.
AYRES, Judge.
Plaintiff instituted this action in tort against the State of Louisiana, pursuant to authority granted by Act 153 of the 1952 session of the Legislature, as the result of an automobile and truck collision occurring July 31, 1949, at the intersection of State Highway 24 and U. S. Highway No. 165 in the Village of Forest Hill, Rapides Parish, Louisiana. The vehicles involved were a Chrysler automobile owned and driven by plaintiff's husband, Dave S. Marler, who was accompanied by plaintiff and her sister, who were sitting in the rear seat, and a wrecker truck, one of about 20 military vehicles of the Louisiana National Guard, proceeding from New Orleans to Camp Polk, near Leesville, Louisiana. In the accident Marler was killed, dying immediately following the impact; Mrs. Marler was seriously and severely injured; Miss Weaver, her sister, also received injuries and has since died; and the automobile, for all practical purposes, was destroyed.
After filing and urging an exception of no cause or right of action, which was overruled, the matter was placed at issue by defendant's answer. After trial on the merits, a judgment was rendered in plaintiff's favor for $67,684.19, less a credit of $10,000 received by plaintiff from her husband's insurer. From the judgment thus rendered, the State appealed. The inadequacy of the award is asserted in plaintiff's answer to the appeal, wherein it is prayed that the judgment be increased to $298,153.71, as originally sued for. The State reurged its exception of no cause or right of action.
The statutory enactment authorizing this proceeding reads as follows:
"An Act
To authorize Mrs. Lois Weaver Marler, a resident of Allen Parish, Louisiana, to file suit against the State of Louisiana, through the Military Department of the State of Louisiana, upon a claim for damages: on account of the wrongful death of Dave S. Marler, her husband, who was killed July 31, 1949, at the intersection of United States Highway 165 and Louisiana Highway 24, Rapides Parish, Louisiana; on account of personal injuries, mental and physical anguish, permanent disability, loss of earnings, medical expenses and property damages sustained by Mrs. Lois Weaver Marler on the same occasion, all as a result of the negligence of members of the National Guard of the State of Louisiana, then acting under the control, direction and supervision of the Military Department of the State of Louisiana, and being in the scope of their duties prescribed at the direction of the Adjutant General of Louisiana, the controlling head of said Military Department; to provide a method of procedure and the effect of the judgment which may be rendered in said suit; to authorize the Adjutant General of Louisiana to settle said claim by compromise and to provide a prescriptive period for said claim.
"Section 1. Be it enacted by the Legislature of Louisiana that suit against the State of Louisiana, through the Military Department of the State of Louisiana, is hereby authorized to be filed and prosecuted to judgment by Mrs. Lois Weaver Marler, a resident of Allen Parish, Louisiana, upon her claim for damages: on account of the wrongful death of Dave S. Marler, her husband, who was killed July 31, 1949, at the intersection of United States Highway 165 and Louisiana Highway 24, Rapides Parish, Louisiana; on account of personal injuries, mental and physical anguish, permanent disability, loss of earnings, medical expenses and property damages sustained by Mrs. Lois Weaver Marler on the same occasion, all as a result of the negligence of members of the National Guard of the State of Louisiana, *29 then acting under the control, direction and supervision of the Military Department of the State of Louisiana, and being in the scope of their duties prescribed at the direction of the Adjutant General of Louisiana, the controlling head of said Military Department.
"Section 2. That said suit may be instituted in the District Court of East Baton Rouge Parish or in the District Court of Rapides Parish, where the accident is alleged to have occurred; that citation and service of all legal processes therein shall be made upon both the Adjutant General of the State of Louisiana and upon the Attorney General of the State of Louisiana.
"Section 3. That the said Adjutant General of the State of Louisiana may, upon concurrence and advice of the Attorney General, settle the claim of the said Mrs. Lois Weaver Marler by compromise.
"Section 4. That should final judgment rendered in such suit be in favor of plaintiff, or should a compromise of the claim result, such judgment or compromise shall be satisfied and paid only out of monies appropriated by the Legislature of Louisiana for that purpose.
"Section 5. That the defendant, in the suit herein authorized, shall not be entitled to file a plea of prescription barring such claim; provided that any suit entered upon the authority herein granted shall be filed not later than the first day of January, 1953.
"Section 6. That except as otherwise herein expressly provided, the procedure in said suit or suits shall be the same as the suits between private litigants.
"Section 7. That nothing in this Act be construed as conferring on the said Mrs. Lois Weaver Marler any different or greater claim or cause of action than she had before the passage of this Act, the purpose of this Act being merely to waive the immunity of the State of Louisiana from suit in so far as the suit hereby authorized is concerned."
It is contended under this Act that it not only does not create a cause of action in favor of the plaintiff but, since the adoption of Act 385 of 1946 amending Section 35 of Art. III of the LSA-Constitution, the Legislature is prohibited from doing more than to provide a remedy for enforcing a pre-existing right and authorizing a suit against the State. In other words, the State contends that the statute only waived the State's immunity from suit and that the State's immunity from liability for tort was not waivedthat the purpose of the Act was merely to waive the State's immunity from suit. Reference has been made to the constitutional provision under which the statute was enacted, which formerly read as follows:
"Whenever the legislature shall authorize suit to be filed against the State, it shall provide a method of procedure and the effect of the judgments which may be rendered therein."
It is argued that, by the amendment of 1946, a very substantial and material change was effected in the constitutional provision, which, by such amendment, reads as follows:
"Whenever the Legislature shall authorize suit to be filed against the State it shall provide the method for citing the State therein and shall designate the court or courts in which the suit or suits authorized may be instituted and may waive any prescription which may have accrued in favor of the State against the claim or claims on which suit is so authorized. The procedure in such suits, except as regards citation and original jurisdiction, shall be the same as in suits between private litigants, but no judgment for money rendered against the State shall be satisfied except out of monies appropriated by the Legislature for the purpose. For the purpose of such suits *30 the State shall be considered as being domiciled in the Capitol. No such suit shall be instituted in any court other than a Court of Louisiana. Except as otherwise specially provided in this section, the effect of any authorization by the Legislature for a suit against the State shall be nothing more than a waiver of the State's immunity from suit insofar as the suit so authorized is concerned. (As amended, Acts 1946, No. 385, § 1, adopted November 5, 1946.)"
By virtue of the language of the amendment, it is submitted by defendant that Act 153 of 1952, merely confers jurisdiction to entertain the suit and does not mean that the State's immunity from liability for the torts of its agents is waived. With this contention and position of the State we are unable to agree. The constitutional provision clearly authorized the statute as enacted and the statute not only waived the State's immunity against suit against it but also its immunity from suit for the negligence of its agents and employees and its immunity from liability for such torts. A construction of the statute as contended for by the State would render the statute a nullity, meaningless, and without any force or effect. If the statute merely permitted plaintiff to physically file a suit in the district court and nothing more, then it did nothing and no purpose was served or accomplished, as she, without authority of the statute, could have done as much. Should she have filed this suit without the statute, the State could and, no doubt, would have filed the same exception, based on its non-liability for the tortious acts of its agents and employees. Such exception would have been meritorious and, no doubt, would have been sustained. The State is contending as much now even in the face of the statute authorizing the suit.
Plainly, it was the intention of the Legislature by its adoption of the statute to waive the State's immunity against the suit in its entirety and to place its defense on the same plane as an ordinary defendant, in the absence of an express reservation to the contrary. The statute, necessarily, was a waiver of the State's immunity as a sovereign in its entirety and does not reserve the right to rely upon its exemption from liability for damages by reason of the negligence of its agents and employees in pursuing the course and in committing the acts wherein plaintiff was seriously and permanently injured and her husband lost his life, in the absence of an express reservation to the contrary.
The Act itself authorizes the suit to be filed and prosecuted to judgment by plaintiff upon her claim for damages on account of the wrongful death of her husband and on account of the personal injuries, mental and physical anguish, permanent disability, loss of earnings, medical expenses and property damages sustained by her as a result of the negligence of the members of the National Guard of the State of Louisiana. The Adjutant General of the State of Louisiana, in conjunction with the Attorney General, was authorized to settle the claims by compromise, and the statute provided that, except as otherwise expressly provided therein, the procedure would be the same as in suits between private litigants. It was, therefore, clearly the intention and purpose of the Legislature to waive the State's immunity from liability for torts of its agents. It is apparent that the Legislature intended to provide for compensation for injury done by waiving the State's sovereign immunity to suit, since to hold otherwise would virtually give the plaintiff a mere right to sue on a non-existent cause, and that such construction would amount to a total destruction of the obvious intent and purposes contemplated by the Act.
The statute included negligence in its terms. That was the object and concern of the statute, and an absurd result is not to be imputed to the Legislature in the enactment, which would result in holding that the intent and purpose of the Legislature was to grant Mrs. Marler only an ineffective and unenforcible right to file a suit, contrary to the obvious purpose to permit her to file and prosecute a suit to judgment in view of the express language authorizing the same and permitting a compromise of *31 her claims and providing for the procedure as in suits between private individuals. The statute did not create a cause of action against the State nor admit that plaintiff had a cause of action or was entitled to recover; it was a waiver of the State's immunity as a sovereign in its entirety, without any reservation of its exemption from liability for damages.
In Varnado v. State, La.App., 136 So. 771, 773, the plaintiff was injured by exploding dynamite caps, poured out of a wastebasket into a fire, which caps had been placed in the wastebasket without his knowledge by employees of the Louisiana Highway Commission. Plaintiff, acting pursuant to Act 25 of 1930, instituted action for damages against the State and the Highway Commission, both of which filed exceptions of no cause and no right of action. It was urged by the Commission that, inasmuch as it was an integral part of the State government and, as such, was as exempt as the State itself from liability for damages caused by negligent acts and torts committed ex delicto by its agents and employees in the construction of the highways of the State. The Court of Appeal for the First Circuit overruled the exceptions, and, with reference to the purpose of the Legislature in passing the authorizing Act, stated:
"The act does not confer on Varnado any more right than was conferred on Abraham Bass by Act 82 of 1878. See Bass v. State, 34 La.Ann. 494. We quote from that opinion, [34 La.Ann.] page 501, as follows: `The consent to be sued does not at all imply an admission or a confession of liability. It is a mere act of grace which does not relieve the plaintiff from the obligation of making out his case, both in fact and in law. (State ex rel. Hart v. Burke) 33 La.Ann. 498. By permitting herself to be sued in this case, the State merely consented to submit to a court of justice the question of her liability under the facts and propositions presented by both the plaintiff and herself.'

* * * * * *
"In this case the Legislature, exercising the authority and discretion vested in it by the Constitution, placed its subordinate, Louisiana highway commission, in the position of a `man' in Civil Code, art. 2315, and of a `person' in articles 2316 and 2317, and invited Varnado to show, if he can, that his cause is just and well founded, and, if so, then the amount to which he is entitled on said account.

* * * * * *
"The Legislature, having for the purpose of the suit placed the Louisiana highway commission in the situation of a `man' in Civil Code, art. 2315, and of a `person' in articles 2316 and 2317, it must be looked on as responsible, just as a man, person, or corporation would be for the faults, negligence, and imprudent acts of its employees, while engaged in the service and doing the work that their service requires. We therefore find that Louisiana highway commission is liable for the damages resulting from the act of its employee in placing these dynamite caps, things known to be dangerously explosive, in plaintiff's store and leaving them there, without his knowledge. What happened might have been looked forward to."
Where the Legislature enacted Act 341 of 1944, authorizing an action by W. Edmond Crain against the State of Louisiana through the Department of Highways upon his claim for damages resulting from accident for personal injuries, fixing a forum for such suit to be instituted, and denying to the defendant the benefit of a plea of prescription, the court overruled an exception of no cause or right of action, wherein it was contended, first, that plaintiff's cause of action, if any, arose out of an accident occurring while he was employed by the Commission and that his action therefore was governed exclusively by the Workmen's Compensation Statute, and, second, that defendant could not be held liable in an action for tort under the fellow servant *32 rule. It was there held that the Legislature had the supreme power to authorize the injured employee of the Highway Department to sue either in tort or for workmen's compensation and authorization of a tort action was a matter of legislative policy with which the courts are not concerned.
The Supreme Court, in Lewis v. State, 207 La. 194, 20 So.2d 917, 920, overruled exceptions to the jurisdiction ratione personae and ratione materiae and a plea of unconstitutionality to a suit brought pursuant to Act 273 of 1942, which authorized the plaintiff there to institute suit against the State of Louisiana upon her claim for damages resulting from the personal and permanent injuries sustained by her while she was confined in a hospital operated by the State at Pineville, Louisiana, which injuries she alleged resulted from "maltreatment" of the employees and the malpractice and negligence of the superintendent of said State hospital. It was further held that the State can waive its immunity to suit and liability. The court stated:
"The power vested in the Legislature by the Constitution to waive the State's immunity from suit is not limited to any particular kind of rights or causes of action.
"Although it is not liable therefor, unless it has voluntarily assumed such liability, the State has the capacity to commit tortious acts, and, as in other cases, where the State has failed to exercise the care required of it, and thereby an injury is sustained, it is guilty of an act of negligence. 59 C.J., States, sec. 336, pages, 193, 194. The State may likewise waive its exemption from liability for the torts of its officers and agents and prescribe the conditions for recovery and where it has voluntarily assumed such liability recovery may be had against it. 59 C.J., States, sec. 339, page 195. Section 35 of Article 3 of the Constitution providing that the State may be sued only with its permission does not mean that conduct which would be tortious in others is not a tort when committed by the State, or by its agents or employees, but is an expression of public policy.
"It can not be disputed that it was the intention of the Legislature in adopting Act 273 of 1942, including the title as well as the body of the act, to grant Miss Annie C. Lewis, the plaintiff herein, the right to sue the State on the cause of action set forth in the legislative enactment.

* * * * * *
"Statutes passed in furtherance of provisions of the character of those imposed by Section 35 of Article 3 of the Constitution are remedial in their nature and should be liberally construed. State v. Curran, 12 Ark. 321, reversed 15 How. 304, 14 L.Ed. 705; Northwestern & Pacific Hypotheek Bank v. State, 18 Wash. 73, 50 P. 586, 42 L.R.A. 33; Stuart v. Smith-Courtney Co., 123 Va. 231, 96 S.E. 241. And this is so, notwithstanding statutes authorizing suits against the state are in derogation of its inherent sovereignty, because such statutes indicate the purpose of the Legislature to authorize a departure from the rule of nonliability in the classes of actions mentioned in such statutes. Welsbach Co. v. State, 206 Cal. 556, 275 P. 436. And it has been held that the construction of such statutes should not be so strict as to violate the legislative intent or reflect on the dignity of the State. Fitler v. Com., 31 Pa. 406."
The court further held that no other meaning or effect could be attributed to the statute other than what is plainly apparent on its face, and that when the title and the body of the Act are compared and construed jointly and the purpose of the Legislature in enacting the law is considered, it was clear that only one object was in view, the authorization of Miss Lewis to file suit against the State of Louisiana for personal injuries sustained by her. In this regard the court stated:
"In the act itself the Legislature, speaking for the State, declared in no uncertain terms that it was willing for *33 Miss Lewis to sue the State and for the State to be sued and stand in judgment on the matter of her claim for the damages she alleged she sustained at the hands of the State's agents or employees in a state institution. It is inconceivable that in granting Miss Lewis the right to prosecute her action against the State the members of the Legislature intended to neutralize her right and to enact legislation that would be manifestly in contradiction of the constitutional provision and of no legal force or effect whatever. It is the duty of this Court, if it may do so consistently, to interpret a legislative act in a way that will uphold its constitutionality rather than to strike it with nullity. State ex rel. Varnado v. Louisiana Highway Commission, 177 La. 1, 147 So. 361.
"The Legislature, by the adoption of Act 273 of 1942, having for its special purpose to permit Miss Lewis to sue the State and to permit the State to stand in judgment in such a suit, and authorizing the payment of any judgment which might be rendered therein, placed the State in the same situation as would be a private corporation which is made a defendant in a tort action. The State in such a suit must be held just as responsible as a private corporation for the negligent acts of its agents or employees while engaged in its services and doing the work which the services required. When the Legislature grants authority to sue the State, the rules of law and procedure applicable to suits between individuals on a like or similar cause of action apply to such a suit so far as they are not negatived by the plain terms of the grant."
The decision in Angelle v. State, 212 La. 1069, 34 So.2d 321, 324, 2 A.L.R.2d 666, cited by the defendant, does not support the State's contention but rather that of the plaintiff. That suit was instituted without legislative consent. In the absence of such authority, plaintiffs proceeded on the theory that the destruction of their property by fire while it was being subjected to disinfection by State agents was an appropriation of the property for public purpose, violative of Article 1, Section 2 of the Constitution, for which suit for compensation will lie against the State without its consent. In disposing of this contention, the court stated:
"Under such allegations, it becomes clear that the real basis for the asserted liability is the dereliction by state agents and not appropriation of private property by the State. But the doctrine of respondeat superior has no application to the state and it may not be sued for torts of its agents even though it has otherwise waived its immunity to suit. Special consent, in the manner provided by Section 35 of Article III of the Constitution, must be granted to authorize the institution and maintenance of an action ex delicto."
That case is, therefore, distinguishable from the case presently before us in that, in the cited case, the suit was instituted without the benefit of a legislative enactment authorizing the same, whereas here the special consent prescribed as a requisite to the suit was given by special legislative act.
The contention that the 1946 amendment to Section 35 of Article III of the Constitution effected a change, so far as actions ex delicto against the State are concerned, is without merit. In Goodwin v. Department of Highways, La.App. 1950, 53 So.2d 161, 164, a suit was brought pursuant to Act 332 of 1948 by a widow for damages for the death of her husband caused by the negligence of the employees of the Department of Highways. That Act provided:
"That nothing in this Act shall be construed as conferring on the said Mrs. Hazel Duling Goodwin any different or greater claims or cause of action than she had before the passage of this Act, the purpose of this Act being merely the State's immunity from the suit insofar as the suit herein authorized is concerned." *34 In the course of its opinion, this court stated:
"This Court recently held in the case of Rosier v. State of Louisiana, La. App., 50 So.2d 31, that when the state has waived its immunity from suit, the Department of Highways must respond in damages where its employees have failed in their duty to provide and maintain warning signs and barricades sufficient to warn the public of a situation calculated to cause death to the occupants of a vehicle who proceed unwarned into the danger which the responsible highway employees know to be in existence."
In Rosier v. State, supra, which was an action for damages brought by the three surviving children for the death of their father and mother and three other minor children when the car in which they were riding, driven by their father, was swept from the highway by flooding waters, which waters had covered the highway for a period of four days preceding the accident to the knowledge of the Department of Highways, which had failed and neglected to place warning signals, signs, flares or lights to warn motorists of the presence of the water over the highway and the dangers of the situation, this court held [50 So.2d 35]:
"The State of Louisiana, through the Legislature, having consented to the present suit, has voluntarily placed itself in the same legal position with reference to liability for failure to warn the public of the dangerous condition of the highway arising from the action of the elements, as that of the municipalities within the state with reference to the roads and streets within their respective limits."
The fateful accident involved in that case occurred Easter Sunday, April 13, 1947, and the act authorizing the suit against the State was No. 226 of 1948.
In construing a statute of a similar nature, the Court of Appeals of Kentucky, in Commonwealth v. Masden, 295 Ky. 861, 175 S.W.2d 1004, 1007, 169 A.L.R. 101, 103-104, stated:
"Chapter 297 of the Acts of 1942, pursuant to which this action was instituted, waived not only the Commonwealth's immunity from action but also its immunity from liability. The act expressly provided for the payment of any judgment rendered or any settlement made. Construing a similar resolution in Commonwealth v. Hoover's Adm'r, 274 Ky. 472, 118 S.W.2d 741, 743, this court said: `When a state waives its privilege of immunity from suits, and permits itself to be made a defendant in a suit by an individual without any restrictions or reservations, it places itself on the same plane as an ordinary defendant, and consents that the plaintiff's claim against it may be determined in the same manner as claims in actions against individuals and corporations are determined.'
"In Pennington's Adm'r v. Commonwealth, 242 Ky. 527, 46 S.W.2d 1079, 1080, the court said: `To construe the resolution to mean that the commonwealth retained its immunity from the suit by reason of the conduct of its agents or employees is equivalent to charging the General Assembly in engaging in an absurdity. The resolution did not create a cause of action against the commonwealth, nor admit that the appellant had a cause of action or was entitled to recover against it. * * * The resolution necessarily was a waiver of the commonwealth's immunity as a sovereign in its entirety, and does not reserve the right to rely on its exemption from liability for damages.'
The State has cited and quoted from authorities of other jurisdictions, some of which apparently and, no doubt, support its position. We are not informed of the constitutional provisions under which the legislative consent was given for the institution of those actions. At least, they *35 are not controlling here in view of the jurisprudence of this State and the pronouncements of our courts to the contrary.
Our conclusion, therefore, is that the State has effectively waived its immunity to suit and liability for damages for the tortious acts committed by its agents, servants and employees. The statute involved did not create any liability on the part of the State of Louisiana but waived the State's immunity to suit and judgment. Plaintiff had the right to establish, if she could, upon the trial of the case there was liability on the part of the State and that its agents, servants and employees were negligent in the performance of their duties.
It was next urged that the members of the Louisiana National Guard are not liable for their torts while on duty and that, accordingly, the State is also free from liability. The basis of this contention is LSA-R.S. 29:31, reading as follows:
"No officer or other member of the military forces in this state shall be indicted, prosecuted, or sued for any injury to person or property while performing or attempting to perform any duty required of him by this Part."
This section absolves members of the National Guard from liability for their acts when they have been ordered by the Governor into active service in the event of insurrection, invasion, riot, or imminent danger thereof, or in the event of public disaster or danger from floods, fire, storm or earthquake, or to assist the civil authorities in guarding prisoners. It has no application otherwise to members of the National Guard, such as while on two weeks' training tour, as was Sergeant Busurelo at the time of this accident.
In State v. Josephson, 120 La. 433, 45 So. 381, the defendant was charged with, prosecuted and found guilty of assault and battery. The victim of the offense was a private in a company of the National Guard of which the defendant was captain. The question was whether or not that case was cognizable by the civil courts or only by a military tribunal. It was contended that the defendant was in active service although his company had not been ordered into active service by the Governor. That is the situation here. The National Guard had not been ordered into active service by the Governor. The court stated:
"But, manifestly, the statute contemplates two kinds of `active service'the `active service' which follows upon call of the Governor, and the `active service' which consists in merely being a member of the organization in good standing. The former withdraws the militiamen from the jurisdiction of the civil courts; the latter does not. In fact, the contention that a member of the militia is all the time not amenable to the powers of the courts can hardly be serious."
Even though granting that Sergeant Busurelo could not be held civilly liable for his acts of negligence in this case, such exemption and grant of immunity would be a personal defense which he, and he alone, could set up against any action instituted against him. This would afford no relief to the State of its liability. This contention is likewise without merit and the State's position is untenable.
It was also contended that a member of the Louisiana National Guard is not an employee of the State of Louisiana. Cited as authority is Lind v. Nebraska National Guard, 144 Neb. 122, 12 N.W.2d 652, 655, 150 A.L.R. 1449. It does not appear that this case is authority for the proposition for which it was cited, in that it was held that a member of the National Guard was an employee of the State. The court passed on the question of whether a member of the National Guard was an employee of the State of Nebraska within the contemplation of the Workmen's Compensation Act. The court stated:
"We hold therefore that the appellee during his period of service was in the service of the state with the Nebraska National Guard." *36 It does not appear, however, that the proper legal designation of the status of Sergeant Busurelo with the State is of importance as he was performing duties pursuant to orders and directives of the Governor and Adjutant General of the State of Louisiana and that he was acting for and on behalf of the State of Louisiana.
The exception of no cause or right of action was, therefore, properly overruled.
The sole and proximate cause of the accident was alleged to be negligence, lack of circumspection and want of requisite skill on the part of Sergeant Busurelo, the driver of the Louisiana National Guard vehicle, such negligence specifically consisting of the following acts:
a. In making a turn from a country highway onto a major arterial highway without ascertaining the presence of vehicles on the other highway.
b. In failing to have his vehicle under proper control.
c. In negligently failing to negotiate the turn within his own lane of traffic and crossing the center line of the highway directly into the path of the oncoming automobile operated by the deceased.
d. In failing to keep a proper lookout.
e. In failing to observe traffic regulations and the "Rules of the Road".
f. In permitting his vehicle to cross the center line in the path of oncoming traffic.
After denying any negligence on the part of Sergeant Busurelo, the State alleged that the plaintiff and her deceased husband could have avoided the accident by the exercise of ordinary care on their part and after actual discovery of the driver's peril or after they should have discovered such peril; that they had the last clear chance to avoid the accident; and, in the alternative, plead contributory negligence on their part in these respects:
a. That neither plaintiff nor her husband was keeping a proper lookout ahead or towards State Route 24.
b. That the Marler automobile was driven at an excessive rate of speed of more than 60 miles per hour, in violation of a municipal ordinance providing a maximum speed of 25 miles per hour.
c. That neither plaintiff nor her husband was exercising any caution or made any effort to avoid the impending collision.
The record establishes than on Sunday, July 31, 1949, Dave S. Marler was driving his new Chrysler 4-door automobile southerly on U. S. Highway 165. The other occupants were his wife, Lois Weaver Marler, plaintiff in this action, and the latter's sister, Miss Willie Weaver of Florida. The ladies were sitting on the rear seat. The trio had been to Alexandria where they attended church services and were returning during the early afternoon to the Marler home in Oakdale.
The New Orleans contingent of the Louisiana National Guard had been mobilized and was then moving in a convoy towards Camp Polk near Leesville, Louisiana, via Louisiana Highway 24, which joins Highway 165 at Forest Hill, Louisiana, forming a "T" junction. Highway 24 is a state highway and Highway 165 is a federal and state highway. The uncontradicted fact is that Highway 165 is a superior highway and has the right of way. When a weapons carrier in this convoy developed engine trouble between Lecompte and Forest Hill, the vehicle driven by Sergeant Busurelo referred to in the record as a wrecker vehicle stopped so that Busurelo, a mechanic, might make such repairs as were necessary and remedy the trouble so that the vehicles might rejoin the convoy. Lt. Antoine Burguieres returned to the disabled vehicle to ascertain the cause of the delay. After probably an hour or more, the three vehicles, the Jeep, weapons carrier and the Army wrecker truck, in that order, proceeded to Camp Polk. The two lead vehicles turned right or northerly from *37 Highway 24 on U. S. Highway 165; the third vehicle, driven by Sergeant Busurelo, proceeded around another automobile, stopped at the junction waiting for traffic to clear, and also turned right by crossing over the center line of Highway 165 and collided with the oncoming Chrysler.
From the testimony, inconsistent with regard to speeds, times, distances and positions, viewed realistically and fairly, with the application of the fundamentals of physics, of simple mathematics and of common sense, the material facts can be determined. The speed of the Marler car was estimated by defense witnesses to be as much as 50 to 60 miles per hour. The police report contained an estimation of 40 miles per hour.
It can reasonably be concluded that as he approached the junction of Highway 24, Marler saw the two lead Army vehicles come upon Highway 165 toward him, saw another automobile stopped at the junction as if awaiting his passage, whereupon the Army wrecker truck suddenly came around the parked vehicle onto and over the center line of Highway 165 in front of the approaching Chrysler, the driver of which immediately applied his brakes and skidded his car 49 feet before crashing into the left front of the Army truck, which was partially in his lane of traffic. The evidence shows that the skid marks were 22 inches to the right or west side of the center line of Highway 165.
This highway junction, as Highway 24, joins Highway 165, has a width of 135 feet and there was no obstruction to the view northerly on Highway 165 from the junction other than probably from the parked vehicle which he passed and the two Army vehicles preceding him. Otherwise, there were no obstructions that would have prevented Busurelo from looking to his right on Highway 165 and seeing the approach of the Chrysler automobile. His duty as to caution was nonetheless prevalent and even to a greater degree.
After reaching the Village of Forest Hill, the rear vehicle driven by Busurelo became separated and behind the other two. The car of Dallas Clark came in ahead of the Busurelo truck and reached the intersection first, following the two lead vehicles which completed a right turn into the highway. Clark stopped about 40 feet from the intersection, specifically for the purpose of awaiting the passage of a car approaching on Highway 165 from his left, traveling north, and, while so waiting, the Marler car came into sight. Notwithstanding that Clark had stopped, awaiting the passage of traffic on Highway 165, Busurelo passed to the left of the Clark car, made a wide sweep in turning into Highway 165, and crossed over the center line of the highway, after which he saw the Marler car approaching at what he said was at a fast rate, at which moment, due to his slow speed and the application of his brakes, he was able to stop instantly. The brakes on the Marler car were applied and the car skidded 49 feet, striking the front end of the truck. As heretofore noted, the intersection was wide, with the flare of Highway No. 24 extending to a width of 135 feet; consequently, there was no need or necessity of Busurelo making such a wide, sweeping turn, requiring that the truck pass beyond the center line of the highway. Busurelo, it appears from the evidence, although some distance behind the two forward vehicles, on reaching the intersection, made no independent observation of his own as to the traffic conditions or as to the traffic approaching on Highway 165 from either direction. Apparently, he was content and felt justified in following the signal of his Lieutenant, given as the Lieutenant entered the highway in the lead in his Jeep. The conditions were no doubt such as it was safe for the Lieutenant and the second vehicle to enter the highway; but, after their entry upon the intersection and after the turn was completed by them, the situation had changed. Dallas Clark had reached the intersection and, as heretofore stated, had stopped to await traffic on U. S. Highway 165 approaching the intersection at that time. Nevertheless, Busurelo drove by the Clark car and entered the intersection, driving the front *38 end of his vehicle beyond the center line, stopping and partially blocking the lane of traffic of the Marler car.
The appropriate traffic regulations are provided in LSA-R.S. 32:235 subd. B:
"* * * the driver of a vehicle intending to turn to the right at an intersection shall approach such intersection in the lane for traffic nearest the right hand side of the highway, and in turning shall keep as closely as practicable to the right hand edge of the highway, * * *."
Busurelo did not comply with this provision of the law, but, in the manner as hereinabove shown, entered the intersection, drove beyond the center of Highway 165 in front of the oncoming Marler automobile at a time and under circumstances that it was impossible for Marler to avoid the impending collision. Neither did Busurelo comply with the stop sign against traffic entering Highway 165. Marler had the right to assume that Busurelo would exercise reasonable care and caution and obey the stop sign or at least would not come over into his lane of traffic. See Leforte v. Gorum, La.App., 7 So.2d 733; Teche Lines, Inc., v. Gorum, 202 La. 993, 13 So.2d 291; Termini v. Aetna Life Ins. Co., La.App., 19 So.2d 286.
In Willis v. Standard Oil Co. of Louisiana, La.App., 135 So. 777, 780, which is a case involving facts similar to the instant case, the court there appropriately stated:
"If the evidence had shown that the driver of plaintiff's car had seen the truck come out and start across the street in time to have stopped and avoided a collision, it would have been negligence not to do it; but the evidence does not show that such was the case. In fact, the driver of plaintiff's car was not called on to act until defendant's failure to obey the law and the resulting danger reasonably appeared, because the driver of plaintiff's car had the right to suppose that the driver of defendant's truck would obey the law."
Marler had the right to assume, until the contrary appeared in time for him to stop, that Busurelo would be able to control his vehicle and keep it on his side of the highway and in his own lane of traffic. Marler's failure to anticipate that Busurelo would not do so does not render him negligent in any way. This court, in New Hampshire Fire Ins. Co. v. Bush, 68 So.2d 254, held that where a motorist, upon approaching an intersection with a less favored street, slowed her automobile in accordance with blinking yellow traffic light and, although observing rapidly approaching truck one-half block distant from the intersection on less favored street, entered the intersection, where collision with truck occurred, motorist was justified in believing approaching truck would obey the stop sign and would stop at intersection, and that her failure to realize that truck would run stop sign was not proximate cause of the collision.
It was held by the Supreme Court in Kientz v. Charles Dennery, Inc., 209 La. 144, 24 So.2d 292, 294, and by the Orleans Court of Appeal in Terrebonne v. Toye Bros. Yellow Cab Co., 64 So.2d 868, that a driver, knowing that a motorist on an intersecting street is required to stop before entering intersection, may assume that motorist will do so unless it is obvious that speed of motorist is so great that motorist can not stop or does not intend to do so.
Therefore, by his grossly negligent acts, Busurelo placed Marler in grave peril, with insufficient time or opportunity to extricate himself, and, being so placed in such position, Marler can not be regarded as having been negligent. It was not essential to his exercise of ordinary care by Marler that he anticipate that Busurelo would not stop or would drive on his side of the superior highway. See Firemen's Ins. Co. v. Boggs, La. App., 23 So.2d 630, and Lively v. State, La. App., 15 So.2d 617, 619. The latter case was instituted against the State under the *39 authority of a special act authorizing suit for damages occasioned by the negligence of a truck driver of the Department of Highways and involved in an intersectional collision on Highway 165 at Columbia, Louisiana. The court stated:
"* * * a motorist has a right to assume that another motorist coming from the opposite direction will not attempt to make a left hand turn unless it can be made in safety, and this presumption may be relied on until the actions of the motorist attempting such a turn indicate that he is not going to observe the law."
Busurelo claimed that his truck had been stopped by the application of full brakes for a second or two when the Chrysler collided with it. The conclusion is inescapable that the acts of Busurelo in driving his truck in a wide, sweeping curve and heedlessly proceeding across the center line in the path of an oncoming automobile and then stopping, constitutes nothing less than the grossest kind of negligence.
Defendant charges Marler with fault in failing to take to the shoulder of the highway to his right. Aside from the fact that with his brakes applied in an effort to stop and avoid the collision, this would have been a maneuver of questionable outcome and benefit, and the further fact that while the shoulder was sufficient north of the intersection, it was not so south of the intersection because of a culvert and "jump-off". Moreover, it is a rule of law that, when faced with a sudden emergency not of his own creation, a motorist need not exercise the wisest judgment possible or make the best choice of alternatives. Human reaction in emergencies is taken into account, and the person acting in an emergency is not held to the same degree of care and caution that would be expected of him in the absence of an emergency. When faced with such a situation, one is bound to exercise only that caution and judgment which could reasonably be expected of an ordinarily prudent person under the circumstances. In Home Ins. Co. v. Warren, La.App., 29 So.2d 551, 554, it was stated, with reference to a motorist in an attempt to avoid a collision:
"Even though she may not have done the best thing or exercised the wisest choice in trying to avert the accident, she was confronted with an emergency which suddenly appeared before her and under the well recognized sudden emergency doctrine even though her choice of escape was not the safest, she cannot be held guilty of negligence on that score alone."
See also Peltier v. Travelers Ins. Co., La. App., 49 So.2d 346.
The State further contends that Marler was guilty of both negligence proximately causing the accident and contributory negligence barring recovery herein in that he was traveling at an excessive rate of speed in the corporate limits of the village in violation of a municipal ordinance fixing a speed limit of 25 miles per hour. That Marler was driving at a speed greatly in excess of the aforesaid limit was established beyond question. The violation of a statute or an ordinance, unless such violation constitutes a proximate cause of an accident, is insufficient to prevent recovery of damages sustained therein. A permissible speed depends on conditions prevailing at the time. Teche Lines, Inc., v. Gorum, supra. A speed of 50 miles an hour by an automobile on a boulevard in the City of Baton Rouge was held not excessive and driver was therefore not contributorily negligent so as to preclude recovery for damages to automobile in collision with an overtaken truck making a left turn at intersection without giving proper signal or driver observing traffic approaching from the rear. Ball v. Home Oil Co., Inc., La. App., 4 So.2d 579.
Whether Busurelo stopped, as he claimed, before entering Highway 165, is unimportant with respect to his responsibility for the collision, for, if we consider that he stopped and looked for traffic, he could and should have seen and is charged with having *40 seen the approaching Marler automobile. In this regard an expression of the court in Firemen's Ins. Co. v. Boggs, 23 So. 2d 630, 632, is appropriate:
"However, we think it not important, so far as legal responsibility for the collision is concerned, whether the car was or was not stopped. If the car was stopped and the driver looked for traffic to her right, as she says, no good reason existed for not seeing Boggs' car then coming toward the intersection, in plain view, down grade, not far away. She says she did not see it until her car had pre-empted the intersection. If she did not stop at all before entering the intersection, her negligence is the more apparent."
The situation at the intersection required at the time a greater degree of care and caution on the part of Busurelo than was exercised by him. He should have respected Marler's right of way, and had he used patience and hesitated before entering the intersection with the superior highway, as Dallas Clark did, the accident would have been prevented. Marler, after being placed in a perilous position of grave danger at a time when it was too late and impossible for him to avoid the collision, could not have been reasonably expected to exercise the same calm judgment of one who had a reasonable opportunity to deliberate and calculate before acting. The last clear chance to prevent the accident was with Busurelo and not Marler. When Marler realized the perilous situation in which he had been placed, he applied his brakes most effectively but failed to stop short of the collision. On the other hand, Busurelo had an opportunity to avoid the accident; he could have stopped his truck behind the Clark automobile, which did stop for the oncoming traffic to clear, and he had sufficient space to make a right-hand turn and remain in his lane of traffic. Regardless of his speed, the Marler automobile had reached a point where, so far as its driver was concerned, the collision could no longer be avoided. Such speed, if excessive and exceeding the lawful limit, was only a condition and not a proximate cause of the collision.
An expression of this court in the recent case of Cone v. Smith, 76 So.2d 46, 49, is very appropriate here:
"That Smith drove at a great, excessive and reckless rate of speed, which speed was in excess of fifty-five miles per hour, contrary to law, is subject to the requirements of law above stated and the factor of speed in order to create liability must not only cause the injury but must be a proximate cause of the injury. It is admitted that Smith was traveling at a speed of from eighty-five to ninety miles per hour when he first observed the approaching Robinson vehicle. After weighing every implication of this fact we still must find that the conduct of Robinson was the sole cause of the collision and the speed of the Smith vehicle was not a contributing factor."
Our conclusion is that Marler was not negligent and, as a consequence, it follows that Mrs. Marler could not have been. She had neither the right nor the power to control the driving of the car; there is no showing of any need of concern or alarm on her part in regard to her husband's driving. There is no legal duty for a guest to maintain a better or a more constant lookout than is required of the driver. If she had kept a constant lookout, it is not shown or suggested how she could have seen more than did her husband. From a most thorough and careful study of the entire record, consideration of which has been given to every part thereof, we are led and impelled to the conclusion that the sole and proximate cause of the accident and the damages sustained and the injuries suffered therefrom were due to the fault of Busurelo, the driver of the National Guard truck, by his failure to stop before entering the intersection or to keep a proper lookout and to observe the approaching traffic, and in heedlessly and recklessly making a wide and sweeping turn, in not keeping in his *41 lane and to the right side of the intersection, and in projecting his truck into the opposite lane of traffic in front of an oncoming car. Marler, confronted with a sudden emergency, not of his making or creation, lacked both time and opportunity to avoid the collision, although, under the facts and circumstances, attempted all that could be reasonably expected of him. It, therefore, follows that defendant should respond in compensation for the damages sustained and the injuries suffered.
Defendant complains that the award of the trial court was excessive, whereas plaintiff alleges the award was inadequate.
The plaintiff and her deceased husband had been married for a period of 25 years at the time of the accident and his death; they had no children; they lived together alone for this period of time; they were devoted to each other and spent considerable time together. There was no history of marital difficulty or tension but, on the contrary, their marriage was shown to have been harmonious. At the time of his death, Marler was 60 years, 8 months and 23 days of age. His income for the year preceding his death was $5,012.48. He had a life expectancy, based on the age of 61 of 13.47 years.
Plaintiff and her husband lived under a regime of community of acquets and gains. During the period of his life expectancy, at his rate of earning, he could have been reasonably expected to earn approximately $67,500.00. Under the community existing between them, one-half of those earnings would have become the property of plaintiff. A calculation of the present value of what would have been her interest in such earnings, by adding legal interest on such sums as would have been earned by the husband from his death to the present time and by discounting at the same rate what would have been his earnings for the balance of his life expectancy as somewhat in the manner calculated on rehearing by the Supreme Court in Jones v. Kansas City Southern Ry. Co., 143 La. 307, 314, 78 So. 568, it would be concluded that the present value of plaintiff's share in her husband's prospective and expected earnings during his life expectancy would be no less than $30,000, which could well be the extent of the loss of her husband's earnings and support.
Plaintiff is likewise entitled to compensation for the loss of her husband's love, affection and companionship, so far as possible to compensate therefor. The sum of $10,000 appears adequate and in line with similar awards.
There is a stipulation in the record as to the actual expenses incurred and for damage done to the automobile, including medical, hospital, nursing, doctors' and drug bills, funeral expenses of the husband and otherwise, aggregating $7,684.19.
Mrs. Marler at the time of the accident was 50 years of age and was gainfully employed in a permanent position and receiving from $200.00 to $250 per month. She could have reasonably been expected to pursue her work for an additional period of several years. At this time, five and one-half years after she was injured, on the basis of her average rate of pay, she would have earned $14,850. This is an item of actual damage. On account of her condition, permanent in character, which will be hereinafter referred to, it is very problematical and doubtful whether she will ever be able to engage again in any work whereby she might earn a substantial income. An award for loss of her earnings, past and future, in the amount of $17,500 appears justifiable in this case.
It would be difficult indeed to find a medical case history in which a patient suffered more severely or for a longer period of time, only to realize that she will continue to suffer to a great extent for the rest of her natural life. Mrs. Marler suffered excruciating pain for years before her partial maximum recovery. Because her back compensates for the lack of motion in her hip, she suffers chronic back pain and will continue to so suffer for life. Mrs. Marler suffered a fracture and dislocation of the *42 left hip and a fracture of the external malleolus of the right ankle. After the accident, she was taken to Oakdale Infirmary and placed in traction so as to immobilize her leg, pull the broken fragments of the femur back into place and reduce the pain. This was effected by drilling a hole in her heel for the insertion of a steel pin to which was attached a weight suspended by a cord over a pulley. She was kept in traction for two weeks in an attempt to bring these bone fragments back into place. This procedure was a failure.
Dr. Daniel M. Kingsley, an orthopedic surgeon, of Alexandria, testifying relative to the injury to Mrs. Marler's hip, stated the shaft of the femur, the biggest bone in the body, was thrown across the body; that the knob of the bone fitting into the socket of her hip was completely broken off and into four pieces and that the whole thing was dislocated. Also, that an extreme pull and twisting was put on the shaft to try to pull it and the broken pieces of the knob or head of the femur back into the socket in place. This procedure, called a "closed reduction", was carried out August 13, 1949, 14 days following the accident.
On August 17, she was removed to the Baptist Hospital at Alexandria, from where she was transported the following day by ambulance to Foundation Hospital in New Orleans, where Dr. Guy A. Caldwell, orthopedic surgeon of Ochsner Clinic, on August 23 performed an operation for removal of the broken fragments of the knob or head of the femur and arthrodesis or stiffening of the hip joint. Dr. Caldwell described her condition when he first examined her thus:
"Yes, she was very uncomfortable, and it was difficult to handle her or move her in any way, because of the pain that would occur at the hip with any slight movement in bed or otherwise",
and in describing her pain during the early postoperative period, he said:
"Yes, she had sufficient pain that it was necessary to administer hypodermics for relief, particularly during the first few days after operation. That is inherent in all operative procedure and postoperative condition, but it is a painful period, which does require opiates for relief."
Following the operation performed by Dr. Caldwell, Mrs. Marler was encased in a plaster cast from the toes on the right side to the chest extending to the knee on the left side; the upper part of her chest and arms and head, other than from her left knee down, were the only parts not in this cast. Mrs. Marler returned in this cast to her home in Oakdale on September 10, 1949, where she was a bed patient under the care of a full-time nurse, who had even to attend to her personal bodily functions for her. She was re-admitted to Foundation Hospital December 19, 1949, and re-encased in plaster and permitted to again return home. She was again re-admitted to Foundation Hospital February 15, 1950, where it was again determined that the healing was incomplete and the plaster cast was again applied in much the same fashion as before. Other than for the periods of examination referred to, the large plaster cast was removed for the first time when she was re-admitted to Foundation Hospital on March 20, 1950.
From an examination of Mrs. Marler on January 4, 1954, Dr. Caldwell stated:
"I think that she has recovered to the stage of maximum improvement, which seems very obvious, because there has been no appreciable change between the examinations of 1952 and 1954, and yet she does have objectively the complete stiffness of the left hip and some stiffness of the left knee, amounting to thirty-five degrees, or lack of complete flexion of about thirty-five degrees, and three-quarters of an inch shortening of her leg."
The doctor's estimate was that Mrs. Marler has suffered a 35 percent permanent disability, with little possibility of further improvement. *43 As of the time of his last examination in 1954, Mrs. Marler could stand and could walk with a limp, and for reasonable distances without pain, although with fatigue in her back. He thought she could probably perform her former duties as a newspaper woman but not entirely without difficulty but with some more fatigue and with somewhat more effort than she formerly did.
Concerning Mrs. Marler's condition while convalescing at her home and before the final cast was removed, Mrs. Melder, her full-time nurse, during the period of seven months, testified with reference to Mrs. Marler's pain that no one, unless they were there, could have realized what she went through, and stated:
"Well, it seemed like that when it got where they would try to get her up, you see, where they put the lighter cast, they got a walker; first we had a stretcher that we would get her in and roll her to the sun some. Then they had a walker for her, something they got out of New Orleans for her, put her arms up on and had a seat in there so she could sit down. Of course, you know she couldn't sit. She couldn't bend and we would get her up in this walker and get around over the house a little in this walker and she suffered awful pain when she done that; you see one ankle was had and that was all awful painful on her but she just had to do those things."
Dr. Kingsley again examined Mrs. Marler on May 1, 1950, when he found that the left hip was ankylosed and there was a 3/4 inch shortening of that leg. One of the serious difficulties found was the stiffness in the left knee. Although she was on crutches, she was started on knee exercises, which exercises, however, failed to eliminate the stiffness. For further treatment of that condition Dr. Kingsley testified:
"I put her to sleep and then putting her on her side, her right side, I put pressure on her leg to bend the knee. I could feel the adhensions crack and pop. When I got down to 90 degrees which is a right angle from the position of 150 degrees, I felt it advisable to stop to prevent too great a postoperative reaction and I advised her when she woke up that I would have to do it again when she proved to me she could hold that range of motion and suffer the consequent pain".
In answer to the question: "In other words, you were tearing and breaking loose the adhesions in her leg there?" Doctor Kingsley testified:
"Yes, sir, and it was very painful. We applied immediate hot packs. We had to use morphine sedation, and of course the knee became quite swollen and irritated, and for a couple of days it was just as stiff as if I hadn't done anything. But then it gradually loosened up and she was able to hold that range of motion".
Later, however, on August 15, it became necessary to treat the knee again due to the fact that the patient was not retaining the motion obtained under anesthesia and the knee was becoming stiff again. After again performing the manipulation, Dr. Kingsley placed her in a cast from the upper thigh to the toes. It was not until October, 1950, that this last cast was removed.
For a period of approximately 15 months following the accident, Mrs. Marler was in one cast after another, completely or partially immobilized, requiring the constant care of nurses, either in hospitals or in her home. Dr. Kingsley was of the opinion that Mrs. Marler would be unable to perform her former newspaper work except with difficulty and pain. From a knowledge of her own condition, Mrs. Marler stated she could not perform her work.
Mrs. Marler has suffered a permanent disfigurement in that her left hip is stiff, necessarily made so in the removal of the fractured parts of the femur. It will not bend. She is prevented from assuming a normal sitting position, from which she *44 not only suffers embarrassment from the disfigurement itself but greater inconveniences and embarrassments, particularly in the attempt at performing the usual bodily functions, at the risk of changing clothes frequently. Plaintiff experiences considerable difficulty in dressing herself. She has to use hooks and other mechanical devices to assist her in dressing.
The extent of Mrs. Marler's mental suffering is not inconsequential. Prior to the accident she enjoyed good health, lived in a comfortable home and lived the life of a typical married woman of her station in life, pursuing her profession as a newspaper woman. From such an environment to the state of an invalid, gradually improving to the state of a permanent cripple, has taken its toll and had its effect on Mrs. Marler's mental outlook.
For the aforesaid physical pain and suffering, for the disfigurement, scarring and permanent disability, and for the mental pain, suffering and embarrassment, an award of $25,000 appears appropriate and adequate in this case.
The State made special request that the damages allowed be itemized, which we have done hereinabove, and that the credit of $10,000 obtained from the husband's insurer be credited to some specific item, to the allowance of which it appears no objection was made and its allowance was not complained of in plaintiff's answer to the appeal. Sufficient evidence is not before the court to enable us to specify the particular item to which the credit should be applied. An allowance of the credit against the whole claim is deemed sufficient for all purposes, and clearly the State is not prejudiced thereby.
For the reasons assigned, the judgment appealed from is amended by increasing the net award to $80,184.19, and, as thus amended, is affirmed at the cost of the defendant of the stenographer's fees only as provided by law; plaintiff is cast for all other costs.
Amended and affirmed.