99 So.2d 795 (1957)
Louella Deville FONTENOT
v.
NATIONAL TRANSFER COMPANY, Inc. et al.
No. 4519.
Court of Appeal of Louisiana, First Circuit.
December 23, 1957.
Rehearing Denied February 3, 1958.
Writ of Certiorari Denied March 17, 1958.
*797 Fusilier & Vidrine, Ville Platte, Tate & Tate, Mamou, for appellant.
Lewis & Lewis, Opelousas, McBride & Brewster, Lafayette, for appellee.
ELLIS, Judge.
Plaintiff as the wife and surviving widow of Jessie C. Fontenot, who was accidently killed on the 30th day of August, 1955 while in the employ of the Atlas Drilling Company, filed this suit against the National Transfer Company, Inc., and its insurer, American Fidelity and Casualty Company, and the American Steel and Wire Company. The American Steel and Wire Company filed an exception of no cause or right of action sustained by the trial court, however upon appeal this decision was reversed and the suit as to the American Steel and Wire Company was remanded to the trial court. Fontenot v. National Transfer Company, Inc., La.App., 93 So.2d 254. In the meantime the case went to trial on its merits as against the National Transfer Company, Inc., and its insurer. After considering the evidence adduced on the trial and the briefs of opposing counsel the lower court rendered judgment in favor of the defendant and against the plaintiff, dismissing the latter's suit, and it is from this judgment that plaintiff has appealed.
On the date of the accident in which Jessie Fontenot was killed he was employed as a "rough-neck" by the Atlas Drilling Company which was rigging up an oil derrick in the Iota oil field. The platform which was to hold the derrick and drilling equipment had been constructed and the derrick had been placed upon it. The next step in rigging up the oil derrick was to haul to the platform and place in position thereon the actual machinery necessary to drill the well, and among this machinery was a big piece called in the oil field language "draw works", which weighed approximately 55,000 pounds, and in view of the fact that the Atlas Drilling Company did not have a tandem truck large enough to haul this big piece of machinery, it contracted with the defendant, National Transfer Company, Inc. The record reveals that the National Transfer Company, Inc., was engaged as a common carrier under a permit from the Louisiana Public Works Commission to "Haul anything for the oil fields." Under the terms of its permit its hauling operation was confined to "oil field work only," and it carried workmen's compensation insurance at the time it was engaged by the Atlas Drilling Company.
On the date of the accident the National Transfer Company, Inc., sent its tandem truck together with the driver employed by the company and a "swamper" who was to assist the driver in the work to be done, to the site of the Atlas Drilling Company's operation. When the driver of the National Transfer Company truck and his helper arrived they were told by the driller, Fruge, to pick up a pipe rack and haul it to be placed on the derrick, which they did, and they next were told to haul an engine by the tool pusher employed by the drilling company, which they also did. The "draw works" was located about a block from the derrick and the truck driver of National Transfer Company was told to go pick it up and bring it to the derrick so that he could be installed on the platform under the derrick. All of the machinery including the "draw works" which they hauled was loaded entirely by the driver and his helper by means of special equipment installed on the National Transfer Company truck. In order to unload this heavy and cumbersome oil drilling machinery, it was *798 necessary that a ramp be placed against the derrick platform so that the truck hauling the machinery could be backed up this ramp and the machinery then pulled off of the truck bed and onto the platform bed. In order to get the machinery pulled off of the truck Atlas Drilling Company had what was called a "rig-up" truck located to the right of the platform upon which the National Transfer Company was to back its truck, and on this "rig-up" truck was a drum located to the rear of the cab with a cable or line called a "rig-up line". This drum was powered by the engine in the truck and the operator of the truck could either pull on the line or could reverse the drum and let out line. This line ran from the drum off the rear end of the truck to a block located near a corner post and from this block on up to the top of the derrick to what is called the crown block thence down the opposite side of the derrick to what is referred to as a "snatch-block". This "snatch-block" was located in the center of the "snub" or "sling-line" which went from one corner support of the derrick to the opposite corner support, and from this "snatch-block" the "rig-up" line then went across the top of the platform of the derrick and was hooked onto the piece of machinery that was to be removed from the truck.
In order to unload machinery from the tandem truck of the transfer company onto the derrick platform a ramp had been placed from the ground at approximately a 45% angle up to a point or position against the derrick platform structure so that the bed of the truck could be in line with the derrick platform. In order to pull the machinery, in this instance the "draw works" from the bed of the tandem truck onto the bed of the derrick platform the Atlas Drilling Company had what was called a "rig-up" truck that sat to the right of the ramp upon which the National Transfer Company's tandem truck had been backed and on this "rig-up" truck was the drum around which was the so called "rig-up" line. This is the line which ran from the drum on the "rig-up" truck which was located just to the rear of the cab of the truck to a block which was apparently attached to one of the derrick platform supports, and from this block the line ran up to the top of the derrick through what was called a crown block thence back down and into what is called the "snatch-block" which was located across the top of the derrick platform opposite the ramp upon which the National Transfer Company truck was backed. This "snatch-block" was held in position by what is called a "sling-line" that was fastened from one derrick support column to the opposite derrick support column. From this "snatch-block" the "rig-up" line was then brought across the derrick platform and attached to the rear of the National Transfer Company truck or to the "draw works" so as to assist the truck in backing up this rather steep ramp in order to place the rear end of the truck in a position so that the "draw works" could be pulled off of the bed of the truck onto the platform of the derrick. The operator of the "rig-up" truck which belonged to the Atlas Drilling Company controlled the drum containing the "rig-up" line and could either pull on this line so as to draw the machinery from the truck to the platform bed or could reverse the turn of the drum and slacken the "rig-up" line. The drum containing the "rig-up" line was of course powered by the motor of the truck.
On the day in question the operator of the National Transfer Company truck and his helper loaded the "draw works" by themselves by means of the special equipment which is installed on such a truck, and backed up to the unloading ramp and by means of being pulled and with the power of the motor backed up on the ramp and placed the truck in position for the "draw works" to be pulled onto the derrick platform. The "draw works" was attached to and rested on what apparently looked like two pieces of timber that acted as a slide when the "draw works" was pulled from the bed of the truck onto the derrick platform. After the National Transfer *799 Company truck had backed up to the ramp and was in position for the unloading of the "draw works" the "rig-up" truck of the Atlas Drilling Company attempted to pull the "draw works" from the National Transfer Company truck but was unable to do so without, in the opinion of the driller, Fruge, possibly breaking the "rig-up" line. The driller of the Atlas Company then instructed three of his men including the deceased, Fontenot, to get a jack and some blocks in order to jack the "draw works" toward the drilling platform. The blocks were placed on the bed of the truck and the jack was placed against them and the other end resting against the "head ache rack" which is a protective device for the cab and anyone who might be in it. The record is not absolutely clear as to whether the blocks were placed against the "head ache rack" and the base of the jack then placed against the blocks, or in the position as previously stated, however, the man started jacking the "draw works" from the truck to the derrick platform and at the same time the "rig-up" truck of Atlas would take up the slack and therefore kept a tight line or pull on the "rig-up" line in order to assist in the removal of the "draw works" as much as possible. The evidence is conflicting as to the exact distance the "draw works" had been moved in this manner at the time the "snub line" broke. The breaking of the "snub line" immediately caused the "snatch-block" to become ineffective and the "rig-up" line became slack as it could swing from the opposite side of the derrick toward the "draw works". One of the questions at issue is whether the "snub line" broke as a result of the failure of the truck driver to hold his truck stationary, in other words, whether the truck moved prior to the breaking of the "snub line". This point of conflict in the testimony will be discussed hereinafter. After the "snub line" broke the truck apparently moved and tightened the "rig-up" line which then, of course, was pulling directly against the girths of the derrick. The derrick began to quiver and the "swamper" or helper of the operator of the National Transfer Company truck, evidently fearing or believing that the derrick was going to fall, hollered to the truck operator to "Let her go," whereupon the truck driver of the National Transfer Company released his brake and allowed the truck to roll down the ramp on the turnaround, and the derrick was pulled over and fell on top of the "draw works" and truck and out in front of it. After the "snub line" broke, the "rig-up" line swung across the derrick platform and was resting against what is described as the girth of the derrick which I understand is a cross member between the derrick uprights, and when the truck moved down the ramp it began to break these girths and caused what was described as a "cracking" and the three men who were doing the jacking crawled over the top of the National Transfer Company truck and jumped off of the front end. One fell to the sideoff of the ramp whereas the deceased and one other man ran straight out in front of the truck. One got a sufficient distance so that the derrick missed him, however, it struck the deceased and immediately killed him.
In this suit plaintiff is suing the National Transfer Company upon the theory that it was a third party sub-contractor under the Workmen's Compensation Act, which gave the plaintiff the right to sue in tort.
The National Transfer Company, Inc. and its insurer, National Fidelity and Casualty Company, contend that they are not responsible for, nor did they or their agents in any way cause, contribute to or bring about the accident, and consequently are not liable for the resulting damage for the following reasons, to wit:
"1. That at the time of the occurrence of the accident, the driver and swamper of the tandem were `borrowed employees' or servants `pro hac vice' of Atlas Drilling Company, and, therefore, were not third parties within the meaning and contemplation of the Louisiana Workmen's Compensation Act, thereby relegating the survivor of the *800 said Jessie C. Fontenot to her claim under the Compensation Act.
"2. In the alternative, and only in the event that the driver and swamper of the tandem are held to have still been in the employ of National Transfer Company, Incorporated and not the servants `pro hac vice' of Atlas Drilling Company, then, in that event only, it is the contention of National Transfer Company, Incorporated that the driver and swamper of the tandem truck were in no way negligent and did not in any manner cause, contribute to or bring about the accident and resulting damages complained of but on the contrary that the accident was due to negligence of the employees of Atlas Drilling Company, co-employees of decedent who were in complete charge and control of the rig up operation and the power truck that broke the line.
"3. In the further alternative, while respondents deny any negligence whatsoever attributable to the employees of National Transfer Company, Incorporated, they show, in the event any actionable negligence be found which is attributable to the fact that the driver of the said tandem truck permitted it to roll down the ramp, that an emergency was created by the joint and concurring negligence of American Steel and Wire Company and Atlas Drilling Company which produced the snapping of the snub line, causing the draw works to suddenly and unexpectedly start sliding forward toward the cab of the tandem threatening thereby not only to crush the three men, including decedent, who were working with a jack between the draw works and the cab of the truck, but also to cave in the cab and possibly kill the driver therein; that, accordingly, any negligence which might be attributable to the driver of the said tandem is excusable and should be held not actionable because of the said emergency created and produced by others over whom the said truck driver and helper had no control; that said driver and swamper in no way caused, contributed to, or brought about this emergency and acted as any reasonable, prudent man would have in view and in the light of this emergency; that, accordingly, and in the alternative, respondents specially plead the Emergency Doctrine as a defense to this action."
While there are many cases in the jurisprudence dealing with the first defense raised by defendants herein, both have cited the case of Benoit v. Hunt Tool Company, 219 La. 380, 53 So.2d 137, 140, in which the Supreme Court of Louisiana reviewed the jurisprudence in which the court was called upon to decide whether one was a "borrowed employee" or servant "pro hac vice". We take the liberty of quoting rather extensively from the cited case as follows:
"It is a well settled principle of law that the master is liable for the torts of his servant committed in the scope and course of his employment, but it is often difficult where two possible masters are involved to determine which is liable for the tort, and to determine such liability we must look to the doctrine of the borrowed servant or employee pro hac vice. In determining liability under this doctrine in some cases the courts have imposed liability on the person in whose business the employee was engaged at the time the tort was committed. In others the test has been the right of control over the servant at the time the tort was committed. It has been pointed out that in applying the latter test it is often difficult to decide just what fact or facts constitute control. Mere division of control does not, in itself, raise the presumption of surrender of control, but there is a presumption that the general employer is liable, and it rests upon him to show that, as to the particular *801 work in question, the servant has been lent and is performing only the borrower's work, and that he was not the defendant's servant at all. It has been said that even the control test is not an infallible one, and that the elements of each case must be taken into consideration. Where, however, it is clear that control by the defendant was coupled with performance for the defendant and in the defendant's business, the result is certain.
"Some courts follow the so called `whose business' test; others the `control' test. According to the Supreme Court of the United States these two tests are really one and the same, and determining who controls the servant is merely a means of determining in whose business the servant is engaged. Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; Denton v. Yazoo & Mississippi Valley Railroad Co. et al, 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310; see Brown Lent Servant Doctrine, Insurance Law Journal of 1949, pp. 343-350, Note, 44 Harv.L.Rev. 1136.
"The decisions throughout this country in which this doctrine has been applied cannot be reconciled, but we shall discuss what we consider to be the leading cases on the subject and then apply the test laid down therein, as we understand it, to the facts in the instant case.
"The first of these is Standard Oil Company v. Anderson supra. In that case the injured employee was employed as a longshoreman by a master stevedore, who was under contract with the Standard Oil Company for the loading of a ship. All the work of loading the ship was done by the employees of the stevedore except the operation of a winch, which was done by a winchman in the general employ of the Standard Oil Company. This winchman hoisted and lowered cases of oil at signals which were given by an employee of the stevedore. The plaintiff was injured by reason of the negligence of this winchman, and the question presented in the case was whether the winchman at the time the injuries were received by the plaintiff was the servant of the defendant, Standard Oil Company, or of the stevedore. * * *
"The court then continued: `It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and placed them under his exclusive control in the performance of it, those men became (become) pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of *802 their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking.'
(Italics ours.)
"In concluding that the winchman was the employee of the defendant, Standard Oil Company, the court pointed out that this employee was in the general employ of the defendant, which selected him, paid his wages, and had the right to discharge him for incompetency or for any other reason, and in order for the defendant to be relieved from liability it must appear that that relation for the time being had been suspended, and that a new like relation between the winchman and the stevedore had been created, which was not supported by the evidence in the case.
* * * * * *
"`* * * Of course in such cases the party who employs the contractor indicates the work to be done and in that sense controls the servant, as he would control the contractor if he were present. But the person who receives such orders is not subject to the general orders of the party who gives them. He does his own business in his own way, and the orders which he receives simply point out to him the work which he or his master has undertaken to do. There is not that degree of intimacy and generality in the subjection of one to the other which is necessary in order to identify the two and to make the employer liable under the fiction that the act of the employed is his act.
* * * * * *
"`In cases like the present, there is a general consensus of authority that, although a driver may be ordered by those who have dealt with his master to go to this place or that, to take this or that burden, to hurry or to take his time, nevertheless in respect to the manner of his driving and the control of his horse he remains subject to no orders but those of the man who pays him. Therefore he can make no one else liable if he negligently runs a person down in the street. * * *'
"In the instant case Guillory was in the general employ of Hunt Tool Company, which selected him, paid his wages, and had the right to discharge him for any cause. By agreement with Morris & Meredith, Hunt Tool Company was to do its regular business through its servants in the common way, and Guillory was doing the work of this defendant, that is, rendering welding service, for which it was to receive an agreed compensation. The materials and welding equipment were its own. The work was done by the defendant for a price as its own work by and through its own instrumentalities and servants in its general employ.
"Since Guillory was in the general employ of Hunt Tool Company, it must appear from the evidence in order for it to be relieved from liability that the relation of master and servant which existed between them had been suspended, and that a new like relation between Guillory and Morris & Meredith had been created and was in existence at the time of the accident.
"Under the circumstances of this case we conclude that it was the work of Hunt Tool Company which was being performed, and that that company had not relinquished the right to control Guillory in the performance of it. The fact that the official of Morris & Meredith suggested that Guillory use an electric torch in the welding of the tank, and that Morris & Meredith pointed out the welding to be done, did not constitute authoritative direction and control but was merely suggestion as to details and constituted necessary cooperation in the work being furnished in the larger undertaking."
*803 In the instant case the National Transfer Company, Inc., was engaged as a common carrier in the general hauling business of oil field machinery and was equipped with the necessary trucks and other equipment to completely rig up a derrick, however his services in the present case were limited to hauling the oil field machinery belonging to the Atlas Drilling Company up to the derricks and assisting in placing it thereon. On the date of this accident and at the time thereof, the operator of the truck and the "swamper" who was helping him were in the general employ of the National Transfer Company, Inc. and were doing the work of the defendant company for which the latter was to receive $16.50 per hour. They were doing nothing more nor less than carrying out the master's general business of hauling oil field machinery. The truck and equipment necessary to do the job belonged to the National Transfer Company, Inc. The operator of the truck was hired by this company, which paid his wages and which, alone, had the right to discharge him for any cause. The Atlas Drilling Company did nothing more in this case than to indicate the machinery to be hauled. The manner and method of loading and hauling rested entirely with the employees of the National Transfer Company, Inc. The loading of the machinery, the hauling of the machinery to the derrick was done solely by the operator of the truck and his helper, and it was also the duty of the operator of the truck and his helper, after loading the truck and bringing the machinery to the derrick, to place the truck in a position where it could be unloaded and to assist in the unloading. It was the duty of the operator of the truck to keep same stationary while the "draw works" was pulled from the bed of the truck. The National Transfer Company's driver had complete control of the loading and hauling of the oil field machinery pointed out to him by the employees of the Atlas Drilling Company and also had complete control of the unloading of said machinery insofar as it might affect his employer's business or property and equipment being used in the hauling. The truck driver could refuse to allow the "rig-up" line to be fastened to the "draw works" in order to pull it off the truck if in his opinion it was not properly done or dangerous, because of other defects. Of necessity there had to be cooperation between the employees of the Atlas Drilling Company and the National Transfer Company in the unloading of the oil field machinery, in this instance, particularly the "draw works". In this record there was no evidence of any control being exercised by the Atlas Drilling Company through its employees over the driver or helper of the National Transfer Company, Inc. other than to tell them what machinery was to be hauled, where it was located on the grounds and where it was to be unloaded and to be placed at the derrick. The work done by the employees of the National Transfer Company, Inc., on the day of this accident was in the course and scope of their authority and employment and in the master's regular business.
We are, therefore, of the opinion that the operator of the National Transfer Company, Inc., truck and his helper were not the "borrowed employees" or servants "pro hac vice" of the Atlas Drilling Company but were and remained the employees or servants of the defendant, National Transfer Company, Inc.
Counsel for defendant National Transfer Company, Inc., has cited the following cases in support of his contention that the employees of defendant on the date of the accident were the "borrowed employees" or servants "pro hac vice" of the Atlas Drilling Company, viz., Sadler v. May Brothers, La.App., 185 So. 81; Dixie Machine, Welding & Metal Works v. Boulet Transp. Company, La.App., 38 So.2d 546, and Benoit v. Hunt Tool Company supra, all of which we will discuss except the last named case which has previously been dealt with herein.
In the Sadler case plaintiff sued the defendant for compensation as the result of *804 injuries which he allegedly suffered while in their employ as the driver of a log truck. The defendant in its answer alleged that at the time plaintiff was injured, he was in the employ of and driving a truck for Dan Wilson, an independent contractor, and further averred that under the law it was entitled to call the said Dan Wilson in Warranty and to recover against him in the event it should be cast in a judgment in favor of the plaintiff. In answer to this call in warranty Wilson denied being an independent contractor and averred that he rented the log truck, including the services of plaintiff as driver, to the defendant at a given price per day, and that the truck had been used by the defendant under that arrangement for several months. The facts with regard to this question in the case were not developed by this court in rendering its opinion on appeal other than as follows [185 So. 83]:
"The lower court properly dismissed the call in warranty made on Dan Wilson as under the testimony adduced he bore no relation whatever towards the defendant except that of the owner of a truck which he had hired out to it, together with the services of the plaintiff as driver. Wilson himself had no supervision or control whatever over the plaintiff who was responsible only to the defendant for the work which he performed."
The Sadler case is therefore distinguishable from the case under consideration for the employees of the defendant company were directly under the supervision and control of said company while engaged in the loading, hauling and unloading of the oil field machinery. The employees of the National Transfer Company, Inc., were trained and skilled in the hauling of oil field machinery and under the facts in this case were fully empowered to refuse any supervision or control which in their opinion was detrimental to their employer's business or property. Furthermore, there was no intent to supervise or control these employees by the Atlas Drilling Company other than to designate the machinery to be hauled, where it was and where it was to be placed. The Atlas Drilling Company could not discharge the operator of the truck of the defendant National Transfer Company or his helper. It is true that they could order them to leave if they were dissatisfied with the results of their work, which would be, in effect, a discontinuance of the contract between Atlas Drilling Company and the National Transfer Company, Inc. Only the latter could discharge the driver of their truck and his helper.
The Dixie Machine, Welding & Metal Works, supra, case is distinguishable from the case at bar. In the Dixie Machine case it appeared that the defendant rented one of his cranes together with the services of an expert operator to the plaintiff to be used by the latter on a job which it had contracted from the Johns-Manville Plant for the erection of a smoke stack. The Court further found that, in an operation of the kind which the defendant was engaged in, the foreman or superintendent of the latter is in complete charge and his orders must be obeyed, and further found that it was clear that the operator of the crane under these circumstances has no right to refuse to obey orders of the superintendent except that if he believes that the carrying out of the orders will endanger himself, he may refuse to carry them out. But in such a case the superintendent may require him to leave and may then proceed with the operation, using such methods as he thinks best. The Court then stated [38 So.2d 551]:
"The truth of the matter is that Boulet had nothing whatever to do with the operation which was being conducted by the Dixie Company, except that he rented to the Dixie Company his crane and secured for the Dixie Company the services of an operator. He was not a sub-contractor employed to do any part of the job. The entire job being done by the Dixie Company. And that particular operation was being done under the supervision of Berniol, *805 the superintendent or foreman of the Dixie Company." (Emphasis added.)
Under the facts found in the last discussed case and the emphasized portion thereof, it is distinguishable from the case at bar. In the case at bar the National Transfer Company, Inc. was a sub-contractor employed to haul certain heavy oil field machinery which was a part of its regular business and occupation under its permit as a common carrier in Louisiana. The fact that the Atlas Drilling Company furnished the "rig-up" truck and some of its employees in rigging up the derrick is immaterial for the record shows that it contracted with the National Transfer Company, Inc., to do the hauling of the oil field machinery necessary in the completion of rigging up the derrick, which was the nature of the defendant transfer company's regular business.
We will now consider the second defense of the National Transfer Company, Inc., that their employees were in no way negligent and did not cause, contribute to or bring about the accident and resulting damages.
It was the duty of the operator and employee of the National Transfer Company, Inc., after he had placed his truck in position for the "draw works" to be unloaded, to set his brakes and see that the truck remained stationary. Plaintiff contends that in this duty he failed and that his failure was the direct cause of the breaking of the "snub line" which precipitated the chain of events that lead to the death of plaintiff's husband. The plaintiff contends that the "snub line" broke as a result of the failure of the operator of the truck of the National Transfer Company, Inc., to keep it stationary, in fact plaintiff contends that he allowed the truck to move just a little which was sufficient to break the "snub line", and that although the truck was brought to a momentary stop, the helper or swamper of the operator of the truck became excited and hollered "Let her go", whereupon the operator released his brakes and allowed this truck to go down the ramp, thereby pulling the derrick down on top of the truck and causing the death of plaintiff's husband. The defendant company contends that the "rig-up" truck pulled too hard on the line and caused the "snub line" to break. It is necessary that we examine the testimony on this point.
It is the testimony of Fruge, the driller of the Atlas Drilling Company, who was on the derrick platform at the time the "snub line" broke, that after his man had jacked the "draw works" about six inches from the platform of the truck toward the derrick platform, the National Transfer Company, Inc., truck "moved a little bit. That is when the line broke and for a minute everything was clear. If the truck driver wouldn't have jumped, everything would have been alright. I mean that is what I believe." Fruge also denied that the operator of the "rig-up" truck kept such a pull on the line as would have broken it. He stated that he was giving the signals to the operator of the "rig-up" truck and that as the men would jack and the slack would come in the line he would signal the operator to take up the slack. He further stated that when the "snub line" broke it gave some four or five feet of slack in the "rig-up" line which was taken up by the defendant's truck as it went down the ramp. Fruge's testimony as to why the derrick fell straight down over the ramp and truck of the defendant company is most logical. He stated that after the snub line broke and the truck again started down the ramp, they took up the slack and that the line then came in contact with the cross pieces called "girths" on the derrick and as the strain on these girths was increased by the weight of the truck and the "draw works" it broke one girth after another, and that when it got to the top the line was free except at that point apparently and the truck, therefore, pulled the derrick straight over on top of the ramp and truck. Fruge also testified *806 that the "rig-up" truck did not have the means or ability of slacking off on the line by reversing the winch fast enough to take care of the speed with which the truck was going down the ramp. It seems that it takes an air clutch and the record fails to show that the "rig-up" truck had such equipment on it. It was also the testimony of the operator of the "rig-up" truck that he could not let out line fast enough to keep it slack as the defendant truck went down the ramp. He also stated that at no time did he put a sufficient pull or strain on the "rig-up" line to cause the "snub line" to break.
Harry Prudhomme, a "rough-neck" employed by the drilling company also testified that while he was jacking on the "draw works" that the truck of the defendant, National Transfer Company, Inc., "rolled forward a little", and that he looked up and that the derrick was kind of shaking and "we started jacking it again and then all of a sudden the truck started rolling off the ramp and I looked up again and the derrick was shaking and I told Jessie and C. L. that it looked as if the derrick was falling and then we started running away." He stated that the cable broke "When the truck started rolling off of the ramp." He further testified in referring to the actions of the truck that: "It rolled a little and they kind of stopped it and then it completely rolled off of the ramp." Further he stated that he heard the "swamper" holler "Let her go". Prudhomme stated that he did not see the "draw works" move or slide back toward the cab of the truck after the line broke and before he and his companions went over the top of the truck in an effort to escape the falling derrick.
Merrick Marks, the truck driver for the Atlas Drilling Company also testified that he was operating the "rig-up" truck and that he made a pull on the "rig-up" line in order to pull the "draw works" onto the derrick floor but that it didn't move so a jack was placed between the "head ache rack" on the defendant company's truck and the "draw works" in order to start it to move, and that as the jack would move the "draw works" he would take up the slack but he denied that he had enough pull on the line to break it. He stated that in his opinion the defendant company's truck "must undoubtedly have undoubtedly rolled down a little bit and broke my back line, you see." He did not see the truck roll, however, until after the "snub line" broke, and then he stated that "the tandem rolled right on down." He was asked if in his opinion the truck had not rolled down the ramp, whether the rig would have fallen and he answered "There wasn't no way in the world that it could turn over unless the truck rolled down and pulled it down."
Felton Ardoin also testified on behalf of the plaintiff that he was employed by the Atlas Drilling Company as a fireman on the day of the accident and that just prior to the falling of the derrick he noticed the three employees of Atlas on the truck jacking the "draw works" and then he heard a commotion, looked up and it appeared to him that the derrick was quivering, "so then I see the big truck started down the ramp and derrick come over."
Testifying on behalf of the defendant was Credeur, who was an employee of Atlas Drilling Company on the day of the accident in the capacity of a "swamper" on the "rig-up" truck. A "Swamper" is one who gives orders or directions to another and in this instance he was giving orders to the driver when to pull on the "rig-up" line and when to "slack" on this line. His testimony does not differ in the main from the other witnesses in that he stated the "draw works" apparently got caught on the tandem and they used a jack in order to start this heavy piece of machinery to sliding off of the bed of the truck, and that when the line would get slack from the jack having moved the "draw works" the operator of the "rig-up" truck would tighten the line again. He stated that the operator of the "rig-up" truck "knows how much to pull," he "knows how much the line can hold." He testified *807 positively that the cable broke before the truck started down the ramp and at a time when the three employees of Atlas were working at the jack on the defendant's truck and no further pull or tension had been placed on the "rig-up" line by the operator of the "rig-up" truck, and on cross examination stated that the truck of the defendant could have rolled a little bit and "made a whole lot of weight. I can't say that it rolled, because I didn't see it."
The tool pusher for the Atlas Drilling Company on the day of the accident was also placed on the stand by the defendant and stated that he did not see the truck move before the line snapped and that he believed he would undoubtedly have seen it as he was in a position to do so if it had moved. However, he did testify, "The truck lurched forward just a little ways and then it rolled on down the ramp," after the line had broken. This testimony would seem to corroborate the plaintiff's version that the truck rolled a slight distance, then momentarily stopped and the "swamper" then hollered "Let her go," whereupon the driver of the defendant truck released his brakes and let it roll down the ramp which caused this derrick to be pulled down. This witness stated positively that the derrick would not have fallen if the truck had not rolled.
The operator of the defendant's truck testified that in his opinion the "rig-up" line broke because of too much pull by the Atlas "rig-up" truck, and that immediately after it broke his truck slid about a foot down the ramp and that he saw the "draw works" sliding toward the "head ache" rack and the cab of his truck, and that, believing that it would kill the three men that had been jacking on the "draw works" and also endanger his own life, he released all of his brakes except the emergency brake and allowed the truck to come on down the ramp. He denied that he paid any attention to his "swamper" who hollered "Let her go." He stated that when the line snapped the weight of the "draw works" bent the screw part of the jack and knocked the jack around so that it allowed the "draw works" to slide toward the cab. After releasing his brakes, he stated that his truck went down the ramp "slowly." It was his opinion that the "draw works" had slid or moved toward the cab of his truck four or five feet from the time that the line broke until he got to the bottom of the ramp, and was in the same position as when he loaded them. The photographs introduced in evidence show that the slides under the "draw works" were still protruding from the end of the defendant's truck and that there was a distance of approximately half the length of the bed of defendant's truck from the end of the "draw works" nearest the cab to the cab or "head ache rack", although this witness testified that there was only approximately three feet distance between the "draw works" and the "head ache rack" when he got to the bottom of the ramp. The pictures, however, speak for themselves and if his testimony is correct that the bed of the truck was 18 feet in length, it shows more than three feet between the head of the "draw works" and the "head ache rack". The testimony by this witness shows that the "draw works" was protruding over about four feet from the end of the truck in the back.
After careful consideration of the testimony we are unable to definitely conclude whether the line broke as a result of the tension placed upon it by the "rig-up" truck of the Atlas Drilling Company or, as testified to by the plaintiff's witnesses some of whom were on the truck, because the operator of the defendant's truck allowed it to roll slightly down the ramp, thereby adding tension and weight on the "rig-up" line. We feel certain that in either event had the operator of the defendant's truck kept his brakes applied and had not allowed the truck to roll freely down the ramp with the exception of the pressure exerted by the emergency brake which he forgot to release, that the derrick would not have been pulled down on top of the ramp, the truck *808 and the deceased. The driver of the truck stated that in his opinion when the line broke even if he had not released his brakes the truck would have slid down the ramp, however, the testimony shows positively that this truck did move either twice or three times before it got to the bottom of the ramp. In other words, most of the witnesses testified that before the line broke the truck moved slightly and then stopped, the derrick quivered, and then the "swamper" hollered "Let her go," whereupon the brakes were released on the defendant's truck by the driver and the truck rolled to the bottom of the ramp pulling over the derrick. Another witness testified that the truck moved three times, that it rolled and momentarily came to a stop, moved again and momentarily stopped, and then went on down the ramp. It would appear from all the testimony that had the brakes been kept full force the truck would have come to a stop even if it did slide and not roll as a result of the increased weight put on the braking system at the time the line broke. In addition had the brakes not been released the truck would have moved so slowly that the deceased most probably would have escaped or been in a position of safety at the time the derrick finally fell.
Defendant next plead that if any actionable negligence be found which is attributable to the fact that the driver of the said tandem truck permitted it to roll down the ramp, that an emergency was created by the joint and concurring negligence of American Steel and Wire Company and Atlas Drilling Company which produced the snapping of the snub line," causing the "draw works" to suddenly and unexpectedly start sliding forward toward the cab of the tandem threatening thereby not only the three men including decedent who were working with a jack between the "draw works" and the cab of the truck, but also to cave in the cab and possibly kill the driver. On this point there is only the testimony of the driver of the truck that immediately upon the breaking of the "snub line" that the "draw works" began to slide forward toward the cab. The surviving witness who was working on the bed of the truck with the jack testified positively, together with the driller and driver of the rig up truck, that when the "snub line" broke the "draw works" did not move but that the truck had rolled a slight distance just prior to the breaking of the line which caused the "snub line" to break and also caused the "snub line" to tighten up against the girths on the derrick, and that they saw the derrick quivering and then the "swamper" of the defendant company hollered "Let her go" and they were warned to get off the truck and at the same time they started getting off of the truck when it began to roll down the ramp. We believe that they were in a much better position and we accept their testimony to the fact that the "draw works" did not move when the "snub line" first broke. In fact these witnesses testified positively that they did not run or try to get off of the truck because the "draw works" were moving but because the brakes had been released on the truck and the derrick was beginning to fall. The pictures introduced show that the derrick fell on top of the "draw works" and a part of this derrick is also resting upon the bed of the truck between the "draw works" and the "head ache" rack and then on top of the cab of the truck and over on the hood and down on the ramp out in front of the truck. Under these facts the blocks and jack could have been knocked around more likely by the derrick or by the force of the derrick falling on them, especially since there is no testimony by the men who were actually working with the jack that the moment the "snub line" broke that the jack bent at that time or that the "draw works" moved an inch at that time. We are therefore of the opinion that if the driver of that truck saw the "draw works" slide forward it was after he had fully released his brakes. Furthermore, we believe that the driver released his brakes because the "swamper" who was helping him hollered "Let her go." There is some testimony however that after the truck came to rest off of the ramp after the *809 derrick had fallen on it that the "draw works" was three or four feet closer to the "head ache" rack or the cab than it was at the time that the "snub line" broke. This testimony is somewhat confusing, however, when checked against other testimony as to the distance the employees of Atlas had jacked the "draw works" at the time the "snub line" had broken and the position of the "draw works" at the time it backed upon the ramp for the purpose of unloading it. It is clear as previously stated from the pictures that there is practically half the length of the truck bed between the front end of the "draw works" and the "head ache" bar and cab of the truck, and we are of the opinion from this testimony that the draw works did not move forward as a result of the breaking of the line but if it was more forward after the truck had come to a complete stop off of the ramp and the derrick had fallen on it that the forward movement was due to some other force rather than the breaking of the "snub line".
We are therefore of the opinion that no emergency was created by the "draw works" sliding forward as the result of the broken "snub line". If the employees of the National Transfer Company, Inc., had done what they were supposed to do at the time the "snub line" broke the deceased would not have been killed nor would the derrick have been pulled down. We are therefore of the opinion that the proximate cause of the accident and death of the plaintiff was the negligence of the driver of the National Transfer Company, Inc., truck in releasing his brakes and allowing the truck to roll down the ramp and pull the derrick down.
This brings us to the item of damages to be awarded to the plaintiff, surviving widow. The testimony shows that the plaintiff and her deceased husband had been married for a period of nearly eight years at the time of his death and that they had no children but had lived together for this length of time and were apparently devoted, as there was no history of any marital trouble. At the time of his death Jessie Fontenot was approximately 27½ years of age and had an income for the year preceding his death of about $5,720. Counsel for plaintiff then argues that based upon the recent case of Marler v. State, 78 So.2d 26, decided by our brethren of the second circuit, that he had a life expectancy of approximately 47 years. This life expectancy was based upon his reaching an age of seventy-four and approximately one-half years. However, he stated that based upon LSA-R.S. 47:2405, which is according to the American Experience Mortality Table the deceased had a life expectancy of 37 years and that regardless of which mortality table this court should follow, one-half of the amount that would have been earned by the deceased, would be in excess of the amount specified in the petition, that is $100,100, therefore he submits that the plaintiff is entitled to recover the amount for loss of earnings and support as prayed for in her petition.
The testimony is not full and complete as to the past yearly earnings of the deceased, however, the best testimony in the records is that of his wife who stated that he averaged approximately $190 to $200 every fifteen days which would average approximately $390 per month for 12 months which would be $5,680.
Now, although deceased had a life expectancy well past 65 years of age, we have come to the conclusion since in the deceased's particular occupation the working life as a general rule does not extend past that retirement age, and since there is no indication as to his particular case that his employment would have continued beyond that date, that we are justified in the exercise of our discretion as a determiner of fact, LSA-Civil Code, Article 1934(3), in basing the deceased's loss of earnings upon a working life of 65 years. However, in determining the deceased's loss of earnings, the rule is that "the gross amount thereof should be reduced to its present worth", as we recently stated in Duree v. State, La.App., 96 So.2d 854, 864, quoting American Jurisprudence.
*810 Following these rules, we find that deceased had a working life of a little over 37 years with a loss of gross earnings of $5,680 per year. This amounts to a gross loss of earnings of $210,160 over the decedent's working life expectancy. Since there is no expert actuarial testimony indicating that a different discount rate should be utilized, we will discount this sum at the rate of five per cent per annum, the legal rate, as was done in Duree v. State, La.App., 96 So.2d 854, Marler v. State, La.App., 78 So.2d 26, and Jones v. Kansas City So. Ry. Co., 143 La. 307, 78 So. 568that is, find the sum of money which invested at the rate of five per cent per annum would produce with withdrawals from principal over the 37 years an annual income of $5,680 per year. Discounting the above gross loss of earnings by the five per cent discount tables shown in "Compound Interest and Annuity Tables," published by the Financial Publishing House (Boston; 1947) p. 671, we find that the present worth of decedent's gross earnings discounted at the rate in question is $94,919.01.
However, of course, only one-half of this is the share apportionable to the plaintiff widow as her one-half share of the community's loss of earnings, (See Duree and Marler cases, supra) which amounts to the sum of $47,459.50.
But even this gross sum of earnings need not necessarily be accepted as the exact loss to decedent of her husband's earnings. The decreased earning power of the dollar; when proven, the more than speculative probability that the decedent's earning powers may increase (which in the present case, the record does not reflect); may appreciate this item of damages. Likewise, the possibilities always inherent that the decedent's gross lifetime earnings may not be as large, because of death, accident, loss of employment, the possibility that the loss of this helpmate's earnings may be mitigated in the future, etc., may depreciate this item of damages. Balancing all these considerations together, and in the exercise of our discretion as the determinant of fact, we think that an award to plaintiff widow of the sum of Thirty Thousand Dollars for the loss of her husband's support and earnings will accomplish the ends of justice.
In addition, plaintiff widow prayed for damages to her resulting from the loss of her husband's love and companionship. We think an award of $10,000.00 for this item to be justified under the circumstances, as in Duree v. State, La.App., 96 So.2d 854; Marler v. State, La.App., 78 So.2d 26.
Further, the evidence admitted without objection proves that the funeral expenses of the decedent were $1207.90. There is no prayer made for the decedent's own pain, suffering or shock.
Thus, we believe the record before us reflects that plaintiff should receive judgment in the total sum of $41,207.90, subject to the subrogation claim of her husband's compensation insurer for compensation.
For the above and foregoing reasons, the judgment herein dismissing plaintiff's demand is reversed; it is therefore ordered, adjudged and decreed in favor of plaintiff, Louella Deville Fontenot, and against defendants, the National Transfer Company, Incorporated, and the American Fidelity and Casualty Company, holding said defendants liable in solido unto plaintiff in the full sum of Forty-One Thousand Two Hundred Seven and 90/100 ($41,207.90) Dollars, together with legal interest thereon from date of judicial demand until paid.
It is further ordered that this award be and the same is hereby subrogated by preference to the claim of intervenor, Old Republic Insurance Company, up to the amount of compensation paid and to be paid by it to Louella Deville Fontenot, plaintiff, in the amount of $30 per week from August 31, 1955, plus $300 funeral expenses, plus $250 attorney's fees for intervenor's attorney.
Judgment reversed and rendered.