148 So.2d 788 (1962)
Mrs. Thelma Thompson HAMPTON et al.
v.
SECURITY STORAGE AND VAN COMPANY, Inc., and Robert Misbach, et al.
No. 816.
Court of Appeal of Louisiana, Fourth Circuit.
December 3, 1962.
Rehearing Denied February 4, 1963.
Certiorari Denied March 15, 1963.
*789 Christovich & Kearney, W. K. Christovich, New Orleans, for the Fidelity and Casualty Company of New York, defendant and appellant
John F. Connolly, New Orleans, for plaintiffs and appellees.
Before REGAN, SAMUEL and TURNER, JJ.
REGAN, Judge.
Plaintiff, Mrs. Thelma Thompson Hampton, individually and on behalf of her nine minor children, instituted this suit against the defendants, Security Storage and Van Co., Inc., its insurer, the Fidelity and Casualty Company of New York, Robert Misbach, the lessor of parking space and Ambrose Smith, the driver of Security's moving van, endeavoring to recover the sum of $151,700.00 for the wrongful death of Emmett Hampton, who died instantaneously from injuries incurred as the result of a collision which occurred in the intersection of Thalia and Magnolia Streets in the City of New Orleans. Plaintiff, the widow of the deceased, asserted that the accident resulted from the negligence of Smith, the operator of Security's van, in failing to stop in obedience to a traffic sign and then entering the intersection at an excessive rate of speed.
The defendants, Security Storage and Van Company, Inc., and its liability insurer, The Fidelity and Casualty Company of New York, answered and denied liability, in explanation thereof, they asserted that while Ambrose Smith, the driver, was employed by Security, he was using the van without permission and was engaged in a personal mission when the accident occurred. In the alternative, they pleaded the contributory negligence of the deceased.
Defendant, Robert Misbach, denied liability, asserting that he merely permitted the van to be parked on his premises in consideration for receiving the business of servicing the vehicle and that he had no control over its movements.
Defendant driver, Ambrose Smith, neither answered nor appeared at the trial hereof.
*790 The trial court dismissed plaintiff's suit against Security, the owner of the van, and Misbach, the lessor of parking space therefor; and rendered judgment in favor of Mrs. Hampton and against the defendants, the insurer and the driver of the van, in the sum of $100,000, which included an award of $28,000 to the widow individually and $8,000 for the use and benefit of each minor child.
From the foregoing judgment, only the defendant insurer has prosecuted this appeal.
The record reveals that at approximately 10 a. m. on November 13, 1960, a Sunday, Ambrose Smith took the moving van, which he was regularly assigned to operate by his employer, from Misbach's Service Station without his employer's permission. A short time later, he was driving in a riverward direction in Thalia Street in an intoxicated condition and at an excessive rate of speed. When he reached the intersection of Magnolia Street, he failed to obey a stop sign and collided with an automobile, driven by Emmett Hampton. The deceased had been traveling in a downtown direction in Magnolia Street when the impact occurred and, following the collision, his vehicle was propelled sideways into Thalia Street. He was thrown from the vehicle into the roadway, where he died moments later.
The negligence of the van operator is conceded and the allegation that the deceased was guilty of contributory negligence in that he was traveling at an excessive rate of speed was not proven.
Therefore, the initial question posed for our consideration is whether the trial court's finding with respect to the liability of the insurer was correct.
It is not disputed that the dismissal of plaintiff's suit against the owner and the lessor was proper, for the driver was not using the van for his employer's benefit and the lessor had no control over the use thereof.
In concluding that the insurer was liable, the trial court found as a fact that Smith, the driver, was operating the truck at the time of the accident with the "permission" of the insured owner and coverage was afforded by the following provision in the contract of insurance, which provides in part:
"III. Definition of Insured
"The unqualified word `insured' includes the named insured * * *
"(2) under coverage A and B, any person while using all owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission * * *."
The pertinent facts, from which the trial court concluded that Security had impliedly granted Smith permission to operate the vehicle at the time of the accident, are these:
Smith had been employed by Security Storage & Van Company, Inc. for a period of eight years prior to the accident. He had worked primarily as a "helper" until 1958, and in this capacity, he was not authorized to drive a moving van. He merely assisted in the moving, loading and unloading of furniture. Prior to 1958 Security had assigned to him the position of "driver"; however, he was involved in several accidents, and after each one was demoted to a "helper" status.
When he became a permanent driver, he was assigned to operate a designated van and was instructed that it could only be used for his employer's benefit unless he received permission from the employer's agents to use the truck for a personal service.
The Security office was situated in City Park Avenue and until 1955 the vans engaged in local moving were parked on the premises; however, a portion of the company's *791 land was expropriated and it became necessary for Security to locate another site to park at least four vehicles. Therefore, Ralph Watermeier, the owner's general manager, entered into an agreement with Robert Misbach, who operated a Shell service station approximately five blocks removed from the Security office, whereby Misbach provided a parking area sufficient to accommodate four moving vans in exchange for a contract to service the vehicles.
The keys to the ignition of each of the vans were placed on hooks attached to a board which was located in the office of the service station. Each operator was instructed to pick up the van he was assigned to drive from Misbach's service station at 7 a. m. of every weekday and report to Security's office so as to receive his orders for the day's work. After performing the duties thus assigned, the drivers returned to the office at approximately 4:45 p. m. to check out for the day. Thereafter, they were instructed to return the vehicle to its parking area in Misbach's station and place the keys on the board provided therefor in the office. Frequently Security's local drivers worked on Saturday and on rare occasions they labored on Sunday.
Misbach possessed no authority to question Security's drivers relative to the purpose for which they desired to remove a van, irrespective of the time, from the service station. Even though Security had no employee to supervise the parking area, it did not place the responsibility for supervision thereof upon Misbach.
The trial court found the following facts, and these are fully supported by the record:
Each driver was assigned one van which was designated for his exclusive use, and there were several occasions when the trucks were not returned to the parking area at night. Smith, in fact, had taken the van assigned to him several times for his own personal use without obtaining his employer's permission. All of the drivers, including Smith, were responsible for and had access to both the keys and the vehicles at any time.
Predicated on the foregoing facts, the trial court concluded that Security had impliedly granted Smith permission to use the van on the morning when the accident occurred since Smith had complete domination and control thereof.
To reach the foregoing result, the trial judge, in well reasoned opinion, reviewed the jurisprudence interpretative of the Omnibus Clause which appears in all automotive insurance policies, particularly in relation to whether the operator of the offending vehicle at the time of the accident was driving it with the permission of the assured.
His reasons, in part state:
"The primary purpose of the policy was to protect the owner, Security, from liability which it might incur because of the operation and use of the truck. To this extent, it was purely a contract of insurance and indemnity inuring to the benefit of Security and any person who might have a claim against it because of the negligent operation of the truck. But by the `omnibus clause' in the policy the insurer went further and agreed to pay damages in certain instances where the owner was not personally liable.
"Parks v. Hall, 189 La. 849, 181 So. 191 (1938) stands as the early leading expression by the Supreme Court of Louisiana on the interpretation of the `omnibus clause'. The court announced two fundamental doctrines applicable in this field of jurisprudence, the first was that:
"`The language employed in the policy is to be construed so as to effectuate the insurance and not for the purpose of defeating it; therefore, if the language used is ambiguous or admits of two constructions, it will be construed in favor of the insured and against the insurer in such a way as *792 to protect the interest of insured who has paid for the indemnity. * * * (Quoted by the court from 42 C.J., section 356, pp. 790, 791.)'
"The second laid down the `first instance' or `initial permission' rule which placed Louisiana in the category of jurisdictions deemed as liberal, see 15 Tul.L.R. 422 (1941), 5 A.L.R.2d 600 (1949).
"The court pronounced the rule in these words:
"`* * * the permission of the assured to Hall to use the car in the first instance, irrespective of the use to which he put the car while in his possession, was "permission of the assured" within the meaning and contemplation of the "omnibus clause" and the insurer is therefore liable to plaintiffs thereunder.' (Court's emphasis).
"The authority or permission making up permission `in the first instance' in the Parks v. Hall case was the order of Hall's employer to have his car washed and greased that day. This in fact was the usual, standing order of that employer."
Although the chauffeur in the Parks case initially drove the car with his employer's express permission, subsequent jurisprudence has formulated the rule that "initial permission" may be either express or implied.
The circumstances from which our judges have found an implied permission are those wherein the employer gives the employee complete control and domination of the vehicle, which the employee is authorized to use merely for his employer's benefit.
There are two cases which appear in this state's jurisprudence factually analogous to the matter now before us, namely, Waits v. Indemnity Ins. Co. of North America, 215 La. 349, 40 So.2d 746, and Dominguez v. American Casualty Co., 217 La. 487, 46 So.2d 744.
In the Waits case, the insured owned a vehicle which was used for transporting railroad laborers to and from their jobs. The owner hired C. D. Selby to drive the vehicle and instructed him that it was to be used exclusively for transporting the workers and for no other purpose. When Selby was not using the truck for his employer's business, he was instructed to leave it parked in an area owned by the railroad, which was adjacent to Selby's hotel. This was done for the operator's convenience. The key thereto was lost and thereafter the vehicle's motor was started by simply crossing the wires which serviced the ignition.
In direct disobedience to the owner's instructions, Selby, accompanied by several friends, drove the truck to a bar located some distance from his hotel and a short time thereafter he became involved in an accident.
In concluding that the doctrine of "initial permission" afforded coverage under the omnibus clause, the court therein stated:
"In the present case, Selby had the initial permission of the insured to use the car and it was placed in his possession and under his control. He alone used the car. It was in his possession and under his control at the time of the accident. Under such circumstances any instructions given Selby as to the use of the car or whether there had been a deviation from the instructions are immaterial and of no moment. This case comes clearly within the rule laid down in the Barks case."
In the Dominguez case, a lumber mill employee was permitted to keep the truck at his home which he used to transport laborers to and from work; however, he was instructed that he could not use the truck for personal services. The employee became involved in an accident after working hours at a time when he was not performing a mission for his employer and the author *793 of the opinion, in concluding there was implied initial permission, rationalized thus:
"Where, however, the employee has, as in the present case, complete dominion and control of the vehicle day and night, saying he lost the initial permission merely because he parked it for a short time would be a highly technical distinction which we believe is unwarranted * * *
"It has been argued that under the jurisprudence of this state as established by the Waits case, that the employee could take the vehicle hundreds of miles away, and even be guilty of theft, and yet the omnibus clause would still be effective. The answer to that is that our doctrine is based upon implied permission, that is, where an employee has been given custody and control of the motor vehicle some discretion on his part in the use must be assumed."
Counsel for the defendant insurer concedes that initial permission is implied in instances where an employee has complete custody and control of a vehicle, but he insists that Smith had neither custody nor control thereof. Therefore, he argues that when Smith returned the moving van on the last workday before the accident occurred, the initial permission was broken and the re-taking thereof on a Sunday was a taking without express or implied permission.
We find no merit in this contention. It is simply a distinction without a real difference. Smith, like the driver in the Waits case, was the only person who used the truck. It was parked in an area of the service station, a short distance removed from the owner's premises, and the attendant or owner of that station possessed no authority to question Smith as to the purpose for which he intended to use the van when it was in the process of being removed from the parking area. The keys thereto were in the service station, accessible to Smith any time he desired to take them.
As the trial judge pointed out, "* * * The only differences found, * * * between the Waits decision and the one before the court are that in the latter there was a situs, somewhat removed from Smith's residence * * * and * * * Smith, the defendant, divested himself of the keys at the end of the day's work."
The fact that Smith did not park the truck in front of his home or in an area nearby does not logically justify a conclusion that he had neither custody nor control of the truck, since the keys were available to him at all times and he could remove the truck from its parking place without accounting therefor to Misbach, the owner of the service station.
In view of what we have said hereinabove, we are of the opinion that this custody and control constituted implied permission and in conformity with the jurisprudence, interpretative of the omnibus clause, we are compelled to conclude that the defendant insurer is liable.
Counsel for the defendant insurer in conclusion asserts that the trial court's award was excessive.
Our jurisprudence is well established to the effect that the awarding of damages by a trial judge is largely discretionary and the amount should neither be increased nor decreased unless there is a clear abuse of discretion.
Mrs. Hampton, the widow, was awarded $28,000 individually; however, the written reasons for judgment do not disclose which factors the trial judge considered in arriving at this amount.
An element of damage to a widow in a wrongful death case is the loss of love and affection of the deceased. While our judges have consistently recognized the futility of endeavoring to fully compensate this kind of loss through the medium of money, yet they have realized that a monetary judgment is the only compensation which is within their power to award in *794 mitigation for the wrongful death of a husband or wife or other loved one.
In several relatively recent cases, a surviving spouse has been awarded for loss of love and affection alone, the sum of $10,000.[1]
In addition, the widow is entitled to a judgment for the loss of future support which results from her husband's death. In evaluating this loss, our courts have computed what the total gross income of the deceased would have been if he had retired at 65 years of age, discounted that amount at 5% per annum, and further divided the discounted amount in half, representing the wife's community interest. This formula was used as a guide in the case of Fontenot v. National Transfer Co.[2]
In the case now before us, Hampton, a longshoreman, was 42 years old when he was killed. Income tax returns and withholding statements furnished by his employers established that between 1955 and 1960, he earned an average annual income of $5,382.09. Using the formula which appeared in the Fontenot case, he had 23 more years to work and would have earned a gross income of $123,788.07. This amount discounted at 5% per annum over a 23 year period has a present value of $72,596.72, and the wife's half thereof amounts to the sum of $36,298.36. It is true that a longshoreman performs arduous duties and possibly might not be able to continue doing so indefinitely, but in the Fontenot case, the deceased, a roughneck, performed comparable arduous services, the court anticipated that he would have been employed until he was 65 years old.
Counsel for the defendant argues that the Supreme Court has specifically disapproved of the use of a mathematical formula to compute damages due to a widow for the wrongful death of her husband, and has cited the case of McFarland v. Illinois Central Railroad Company[3] to support this argument.
It is true that the court therein observed that the amount of damages due could not be determined upon any scientific basis; however, it also emphasized that quantum should be left to the discretion of the judge or jury. In the McFarland case, the court of appeal applied a formula to increase the amount of the award to the surviving spouse.
While we have used the mathematical formula as a guide in computing the speculative loss of future support to plaintiff herein, it has been used solely for the purpose of determining whether the trial judge abused his discretion in awarding the widow $28,000, and not to increase or decrease the award of the lower court.
We are therefore of the opinion that the award of $28,000 to the widow was not excessive.
Turning our attention to the award of $8,000 to the plaintiff for the use and benefit of each of her nine minor children, we notice that the quantum awarded to children, in several relatively recent cases, for the loss of love and affection of a parent was $7,500.[4] In addition, these minors will also be deprived of future support that would have emanated from the father's half of the community earnings; therefore, we are also of the opinion that an award of *795 $8,000 to each of nine minor children was not excessive.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.
NOTES
[1] Toney v. Pope, La.App., 110 So.2d 226 and Fontenot v. National Transfer Co., La.App., 99 So.2d 795, and cases cited therein.
[2] 99 So.2d 795. See also Brown v. S. A. Bourg & Sons, Inc., 239 La. 473, 118 So. 2d 891, 895 (see footnote 5) where this formula is cited with approval.
[3] 241 La. 15, 127 So.2d 183.
[4] Toney v. Pope, La.App., 110 So.2d 226; Guidry v. Crowther, La.App., 96 So.2d 71, and cases cited therein. McFarland v. Illinois Central Railroad Company, La. App., 122 So.2d 845 (1960); writs refused with respect to quantum awarded minors, see McFarland v. Illinios Central Railroad Company, 241 La. 15, 127 So. 2d 183 (1961).