REID, Judge.
This action for personal injuries arose out of an explosion and fire which occurred at the Wyandotte Chemical Corporation Plant in Ascension Parish on September 10, 1958. The plaintiff, Sam Maggio, was employed by the Fluor Corporation as a pipe fitter. Fluor had a contract with Wyandotte to construct a chemical plant at Geismar, and, as the prime contractor, entered into a subcontract with A. J. Toups Company, Inc., under the terms of which Toups was to line the interior of a number of large tanks designed to store various chemical compounds.
On the day in question the plaintiff was working on a scaffold some six and one-half feet above ground at a point located some twelve to fifteen feet from the man hole entering tank number 325, one of the tanks the A. J. Toups Company, Inc., was lining. At approximately 3:00 P.M. there was an explosion and fire in this tank and the force therefrom cast the plaintiff to the ground and caused him to suffer certain injuries which he claims are severely painful and disabling.
The plaintiff’s petition named A. J. Toups Company, Incorporated, its insurer American Liability Insurance Company, and two other defendants, the Wyandotte Chemical Corporation and the Chicago Bridge and Iron Works. Wyandotte Chemical was dismissed upon exceptions of no cause and no right of action.
The Lower Court rendered judgment in favor of the plaintiff, Sam Maggio, and against the defendants A. J. Toups Co., Inc., and American Mutual Liability Insurance Co., in solido in the sum of $22,620.63 together with legal interest from date of judicial demand until paid and all costs. This is broken down to an award of $14,000.00 for loss of earnings, $7500.00 for. physical pain and suffering and mental anguish, and medical expenses in the sum of $1120.63. The judgment further recognizes the claim of the Intervener Continental Casualty Company in the sum of $7878.86 plus any future workman’s compensation paid by it to the plaintiff and ordered the same paid by preference. The judgment further dismissed all claims against Chicago Bridge and Iron Company.
From this judgment the plaintiff, Sam Maggio, the defendants A. J. Toups Company, Inc., and American Liability Insurance Company have appealed devolutively.
The plaintiff contends that an employee of the defendant, one Charles A. Henry, was guilty of negligence which proximately caused the explosion herein sued upon in that Henry undertook to spray the inside of the tank with a highly inflammable compound while using an electric light and extension cord which was “dangerous, defective, and unfit” for such purposes and further, he failed to use an essential safety device, a blower fan, to exhaust fumes from the tank. The absence of the blower fan is *439 not contested. The defendants contend the electric light and extension cord were not defective hut if they were defective defendants are absolved from responsibility because A. J. Toups furnished the rig by the Fluor Corporation, plaintiff’s employer. The plaintiff attempted to show Henry triggered the explosion by breaking a light bulb or otherwise causing a spark when he emerged from the tank in which he had been applying a substance known as “Neoprene 100” for approximately two (2) hours prior to the explosion. No where in the record is there any proof of the actual cause of the spark which triggered the explosion but the fact of the explosion bespeaks the spark which caused it.
Charles A. Henry testified he had been spraying in the tank for approximately two hours prior to the explosion; he was familiar with the printed instructions concerning the use of “Neoprene 100” which contained the following admonitions:
“Mix resin with accelerator in a well ventilated area. Keep all flames away from working area. Always supply adequate fresh air during application. In confined areas such as tank lining application, workmen must wear airline respirators. The solvents in Neoprene 100 primer and finish are flammable.”
He testified Toups ordinarily did not use such a “jerry built” device as the light and extension cord such as he was using on the day in question, but instead used an explosive-proof safety light when applying Neoprene 100. He further testified it was customary to use a blower fan to exhaust the fumes from the tank but he did not do so on the occasion in question, because he did not consider two hours a sufficient time to necessitate the use of the blower. However, in his deposition taken prior to trial he stated he did not use the blower because some of his co-workers were using them in other tanks and one was not available for him. Henry testified he heard a rum.bling noise just as he climbed out of the tank and he immediately began running because he knew of the danger involved if the fumes were on fire. He further testified he had the light bulbs in his left hand and they were burning when he emerged from the tank. However, two eyewitnesses to his departure from the tank both testified he did not have the light bulbs in his hand and if he had the lights in his hand they would have seen them.
The two witnesses who testified Henry left the tank without the light bulbs in his hand also testified as he exited from the man hole Henry kicked something hung up in the doorway in an effort to untangle it. The “jerry built” electrical apparatus was an extension cord containing two bulb sockets at the end opposite the electrical outlet instead of one socket made in a “Y” form which would hold the bulbs apart. There was no protection surrounding the bulbs such as mesh wire grill, and after the accident it was discovered the bulbs were broken. Henry testified the bulbs broke when he dropped the cord to run away from the tank.
Mr. Christofferson, a qualified civil engineer and member of the Steel Structures Painting Counsel Research Committee, testified at length with respect to the solvent xylon, a highly volatile, flammable and explosive hydrocarbon compound, used in Neoprene 100. He explained any temperature above 75° F. would cause vapors to be given off from the solvent which would form a combustive mixture. It is clear the temperature on September 10 at 3:30 P.M. inside the steel tank in question was considerably above 75° F. The outside temperature at the time was 88° F., and the relative humidity was 40%. Mr. Christofferson stated whenever a mixture of xylon vapor becomes as concentrated as one to seven percent, i. e. one to seven parts of xylon vapor to 100 parts of air, an explosion will result if a spark is applied. He testified exhaust equipment was standard and necessary safety equipment and it is recommended to use all spark proof equipment. He stated proper ventilation would prevent *440 the possibility of an explosion in that the concentration of xylon in the air will remain less than one percent.
The type of accident involved in this suit ordinarily does not occur when due care has been exercised. The principal enunciated in the case of Horrell v. Gulf & Valley Cotton Oil Co., Inc., 15 La.App. 603, 131 So. 709, is applicable to the case at bar. In that case the Court found the actual cause of an explosion had not been shown, but went on to hold as follows:
“Where a plaintiff cannot be expected to have any information as to the causes of an accident, whereas defendant must be assumed to be fully informed, and where the accident is of the kind which ordinarily does not occur when due care has been exercised, plaintiff need not allege nor prove the particular acts of omission or commission from which the accident resulted; but the accident itself makes out a prima facias case, casting on defendant the burden to show absence of negligence, and this rule is of peculiar applicability in cases of boiler explosions.”
In this connection it is significant to note after this explosion numerous types of safety precautions were used whereas in the circumstances surrounding this accident practically none had been used. Certainly A. J. Toups Co., Inc., through its agent Henry was negligent in applying the Neoprene 100 and this negligence was the cause of the explosion. Without this negligence there would have been nothing to explode.
Dr. Lewis Meyer treated the plaintiff for injuries sustained in this accident and diagnosed his injury as a comminuted fracture of the right heel bone. The plaintiff was in the hospital for one week and was in a cast for some six months after which he walked on crutches for approximately five additional months. Dr. Meyer testified the plaintiff’s injury was a painful one and that up to and including the last visit, which was just prior to the trial, the plaintiff was not able to discharge the duties of a pipe fitter, his usual trade and occupation.
Dr. William Dowell, an orthopedist testified plaintiff sustained disability of between 15 and 20 per cent based upon 100 per cent as being equivalent to amputation of the right leg at the knee.
Dr. Moss M. Bannerman attributed the same degree of disability to the injury as did Dr. Dowell, but stated plaintiff should be able to return to his normal occupation within three or four months after the date he was examined by Dr. Bannerman, which was in November, 1960, some one year prior to the trial.
The defendants contend since the plaintiff was 61 years old at the time of the accident and had suffered with a varicose vein condition before this accident he was not disabled as a result of the accident herein sued upon. However, the fact remains at the time of the accident the plaintiff was performing the duties of a pipe fitter, and had been so employed over the years. It is well settled in the jurisprudence that a defendant takes a plaintiff as he finds him. Since he was able to work prior to the accident and was disabled subsequent thereto, it is elementary the accident is the cause of the disability.
The Trial Court limited the recovery that it awarded the plaintiff for loss of wages to the normal retirement age of 65. With this finding in this set of circumstances we find no quarrel. Fontenot v. National Transfer Company, La.App., 99 So.2d 795. The Trial Court found the plaintiff was earning $3.50 per hour or $28.00 per day and that a pipe fitter can expect an average of eight months work in any one year. Plaintiff’s income tax return for the year prior to the accident is in the record and shows he earned in excess of $5000.00 during that year. On this basis the Trial Court found the plaintiff could be expected to earn at least $4500.00 per year for the three or four years remaining before he reached 65, or a total of some $13,500.00 to *441 $18,000.00, and awarded $14,000.00 for this item. We feel this award is justified. The Trial Court awarded $7500.00 for physical pain and suffering and mental anguish. Considering the testimony of Dr. Meyer we feel this award is neither inadequate or excessive. There is no contest with respect to medical expenses which amount to $1120.-63.
For the reasons assigned the judgment of the Trial Court is affirmed.
Affirmed.