REGAN, Judge.
The plaintiff, Louis Joseph Ledet, filed this suit individually and on behalf of his minor son, Sterling Ledet, against the defendants, the Parish of Jefferson and its liability insurer, Fireman’s Fund Insurance Company, in an endeavor to recover the sum of $98,968.73, representing damages which he asserts were incurred by himself and his minor son as the result of the negligent operation of one of the defendant’s trucks, by its employee, William J. Shank.
The defendants answered and denied the accusations of negligence asserted in the plaintiff’s petition and alternatively insisted that the accident resulted from the fault of Sterling Ledet in the operation of his motor vehicle.
In addition, Maryland Casualty Company intervened herein in an endeavor to recover the amount of $1,813.92, representing compensation paid to Sterling Ledet as the result of the injuries which he incurred in the accident.
Following a trial on the merits, a judgment was rendered by the lower court in favor of the plaintiff [1] in the sum of $17,-328.77. Judgment was also rendered in favor of Maryland Casualty Company by virtue of its intervention in the amount of $1,813.92.[2]
*9 From that judgment, the Fireman’s Fund Insurance Company has prosecuted this appeal.
This case was consolidated with a similar suit arising out of the same accident in order to facilitate and expedite the trial thereof. The suit referred to is entitled Thibodeaux v. Maryland Casualty Company, Louis Ledet and Ledet Bros. Supermarket, La.App., 199 So.2d 6. In the Thibodeaux case, the plaintiff was a passenger in the Jefferson Parish truck, and asserted that he was entitled to recover the sum of $17,295.00 for personal injuries incurred as the result of the collision.
The trial judge made a thorough analysis of this case in his written reasons for judgment, which in our opinion fully encompass both the facts and the law posed for our consideration and the result which we have agreed should be reached.
“With regard to the facts of the accident itself, the testimony indicates .that at approximately 4:00 P.M. on the 31st day of July,-1962, the Ledet automobile collided with a Jefferson Parish water truck which was being operated by a Mr.. Shank, an employee of the Jefferson Parish Waterworks District #2. The facts further indicate that Gerald Joseph Thibodeaux, one of the plaintiffs in these consolidated suits, was a passenger in the Parish truck driven by Shank. The facts further indicate that at the time of the collision the Ledet automobile was being operated by Sterling Ledet and he was alone in his automobile.
“According to the testimony, the Jefferson Parish water truck was coming from an area known as Avondale Homes Subdivision and attempting to cross the westbound lanes of traffic on U. S. Highway 90 and then make a' left turn into the eastbound lanes of said highway. The record further indicates that this is a T-type intersection and the truck approaching U. S. Highway 90 from the Avondale Homes area was faced with a Stop, sign. The testimony shows that at this same time the Ledet vehicle was traveling in a westerly direction on U. S. Highway 90.
“The weather at the time of the accident was fair and dry and traffic conditions were very light. Visibility was good.
“Highway 90 at this point is a four-lane highway divided by a narrow neutral ground. Two lanes proceed in an easterly, direction and two lanes proceed in a westerly direction. At this particular point, there is an opening of approximately 80 feet in the neutral ground and the only intersection in the immediate area is the one to the Avondale Homes area. There appears to be no other traffic controls on U. S. Highway 90 in this area except the Stop sign facing the Parish truck.
“It will also be noted at the time of the accident, the posted speed limit in this area for Highway 90 traffic was 65 m. p. h.; however, the Court takes judicial notice of the fact that as of the time this matter was tried, the actual posted speed limit in this area was 70 m. p. h.
“It appears from the testimony that the Parish water truck driven by Shank was preceded into the intersection by another Jefferson Parish water truck which had already effected a turn at the intersection and headed east towards New Orleans on Highway 90 for some distance before the Shank-driven Parish truck approached Highway 90. Although Shank himself testified that he stopped for the Stop sign on Highway 90, a disinterested witness, Mr. James Ferguson, positively testified that Shank did “not” stop for the Stop sign but proceeded onto Highway 90 and attempted to make a left turn into the eastbound lanes.
“Ledet testified that he had been following the Ferguson vehicle for some *10 time in the right-hand lane of the westbound traffic and started to pass the Ferguson vehicle prior to arriving at the collision intersection. Ledet positively testifies that as he was passing the Ferguson vehicle, his speed was approximately 63-65 m. p. h. Ledet further testified that he was conscious of his speed because of the fact that he had noticed police officers in the area on his trip into New Orleans earlier that morning. Ferguson testified that the first time he noticed the Ledet vehicle was when the Ledet vehicle was immediately at his left and abreast of his car. Ferguson also testified that he was very conscious of his speed and that he was traveling somewhere between 60 and 65 m. p h. when he first observed the Ledet vehicle abreast of him. The facts further indicate that Ferguson saw the Parish water truck before it came onto Highway 90 and as it came onto Highway 90. Ferguson further testified that when the Parish water truck actually came onto the Highway, he, Ferguson, was decelerating and had to apply his brakes to avoid a collision with the Parish water truck.
“The facts further indicate that the Ledet vehicle and Ferguson vehicle traveled abreast of one another for some distance on the highway after the brakes on both cars had been applied, and that eventually the left front side of the Ledet vehicle met in collision with the left rear corner of the Parish water truck. This collision occurred in the left or inside lane of the westbound traffic.
“Considerable damage was done to the Ledet vehicle with impact to. the fender and lighter metal parts of the Ledet vehicle and it is obvious from the pictures introduced that the left rear of the truck bed actually crushed the windshield of the Ledet car.
“Also,' it is obvious from the record that Ledet sustained serious personal injuries as the result of this impact. The said injuries will be more fully discussed hereinafter.
“It is the contention of the defendant, the Fireman’s Fund Insurance Company, that their driver, Shank, was not negligent in any way and even if he was, that Ledet was contributorily negligent. The defendant attempted to establish that Ledet was traveling at an excessive rate of speed and that this excessive speed was a contributing factor to the accident; or that Ledet should have seen the truck coming into his lanes of traffic sooner; or that Ledet should have turned in one direction or another to avoid the collision.
“With regard to the second contention, the Court is of the opinion that, under all of the circumstances and conditions existing at the time, that Ledet had no reason to believe and could not have anticipated that the Parish truck would come directly into his path. It will be remembered that the weather conditions were almost perfect and although visibility was good from a weather standpoint, the Ledet vehicle was in the process of passing another vehicle and the other vehicle was to Ledet’s right, the same direction from which the Parish truck came. It is very obvious to this Court that the vehicle to the right of Ledet hindered Ledet’s vision to the right. Furthermore, this is an open type of highway, divided by a neutral ground and' obviously designed and intended to be a high speed artery of transportation. This Court cannot' conclude that Ledet should have been required to expect that a vehicle would pull from a side street directly into his path on a state highway wherein maximum speed under state law is permitted. There were no unusual circumstances here at all to indicate that the Parish water truck would pull out into the path of the Ledet vehicle until Ledet actually observed the vehicle coming into his lanes of' traffic.
*11 “The law in this State is clear to the effect that a motorist traveling on a favored or right-of-way street may indulge in an assumption that traffic coming from less favored streets will observe the traffic controls present. This principle is well set forth in the case of Williams v. State Farm Mutual Insurance Company [La.App.], 148 So.2d 126 at page 128 when the Court states:
‘A motorist traveling on the right-of-way street has the right to indulge in the assumption that traffic approaching from less favored street will observe the law and it is only in exceptional circumstances where the motorist on the favored street could have . avoided the accident by the exercise of the slightest sort of observation that he will be found derelict.’
“Also, the defendant, Fireman’s Fund Insurance Company contends that possibly Ledet could have done something to avoid this accident after he observed the vehicle in his lane of traffic. After hearing all of the testimony in this case, the Court can simply not agree with this theory. The testimony indicates that as soon as Ledet saw the Parish water truck which was apparently at the same time that he came abreast of the Ferguson vehicle, Ledet locked his brakes in an effort to avoid the collision. It is clear to this Court from the testimony of Mr. Ferguson, Ledet himself, and even the testimony of the driver of the truck, Mr. Shank, that Ferguson’s vehicle was to the right of Mr. Ledet’s vehicle and it was impossible under these circumstances for Mr. Ledet to turn to the right to attempt to avoid this collision. It is also abundantly clear to this Court that Ledet could not have turned his car to the left because in so doing he would have of necessity, had to traverse the neutral ground and enter the eastbound lanes of traffic, a procedure which would have been more dangerous than the situation Ledet found himself in. This Court concludes that Ledet simply found himself in a position of danger and there was nothing more he could do to extricate himself therefrom other than doing exactly what he did, to-wit, apply his brakes to the fullest capacity.
“Much testimony was brought forth at this trial concerning the speed of the Ledet vehicle at the moment he saw the Shank vehicle and started applying his brakes. Ledet’s own clear, positive and convincing testimony was to the effect that he had just started to pass the Ferguson vehicle, that he was very much aware of his speed and that he knew his speed was approximately 63 or 65 m. p. h. Ledet’s statement is further corroborated by the testimony of Mr. Ferguson, a disinterested witness and who states that when he first observed the Ledet vehicle, it was abreast of him and that Ferguson himself was only traveling 60 to 65 m. p. h. Ferguson at no time indicated that Ledet was passing him at a rapid rate of speed.
“There was much testimony regarding skid marks and opinions as to the speed based on skid marks. It will be remembered, however, that the only two people who could positively be in a position to observe Ledet’s speed first hand were Ledet himself and Mr. Ferguson.
“Experts for Ledet as well as an ex- • pert for the defendants were called to testify as to Ledet’s speed based on the skid marks. This Court can’t rely too heavily on this testimony however because there is actual conflict in testimony as to the length of the skid marks. Further, the defense expert admits he never visited the scene of the accident to determine the nature of the road surface. The expert for the plaintiff, although better qualified than the defense expert, admits that his calculations could be incorrect one way or another as much as 4%.
*12 “Mr. Claude Parker, the driver of the vehicle that preceded the Shank Parish truck into the intersection, attempts to estimate Ledet’s speed. Mr. Parker’s testimony is not all impressive to this Court because of obvious inconsistencies found therein and frankly, Mr. Parker was not in any position to adequately gauge or estimate Ledet’s speed. The same is true for the testimony of Mr. Shank.
“Regarding speed, the Court is convinced that Ledet’s speed was approxi- * mately 65 m. p. h. at the time he started to apply his brakes. This Court, under these circumstances, is further convinced that at 65 m. p. h. Ledet could not have •stopped his car in time to avoid this collision. Although there is testimony to the effect that Mr. Ferguson was able to stop his car at approximately the site where the impact occurred, this Court is convinced from the testimony which was produced at this trial, that Mr. Ferguson had an opportunity to see the Parish water truck prior to the time Ledet saw it and that Ferguson accordingly, was able to take quicker preventative action than Ledet was able to.
“Furthermore, even assuming, in arguendo, that the Ledet vehicle was traveling 5 miles per hour above the speed limit of 65 m. p. h., this Court, considering all of the facts that have been heard in this case, to-wit, the nature of the highway, the weather conditions, the light traffic conditions and the fact that the Ledet vehicle was actually in the process of passing another vehicle, is convinced that his speed was in no way the proximate cause of the accident. In this connection it is important to point out that it is conceded by all parties hereto that Ledet was actually in the process of passing the Ferguson vehicle.
“This Court is of the opinion that Shank was definitely negligent in pulling his vehicle into the path of the oncoming Ledet vehicle and the oncoming Ferguson vehicle contrary to the clear mandate of State law. The Court is further of the opinion that Shank’s negligence was the proximate cause of the accident and the only way that Ledet could have been denied his claim herein is if defendant could have proved by a preponderance of the evidence that Ledet was guilty of contributory negligence. It is this Court’s understanding of the law that in order for defendant to claim that any excessive speed on the part of Ledet was contributory negligence, it is necessary that defendant show that this negligence was actually a proximate cause of the accident. This principle is stated many times in our jurisprudence and is very aptly stated in the case of Smith v. Aetna Casualty & Surety Co. [La.App.], 128 So.2d 235, wherein the Court states:
‘Excessive speed, although a violation of law, is not necessarily regarded under our jurisprudence as a proximate or contributing cause of every accident. Plaintiff is not to be denied recovery purely upon the basis of such showing unless it is established that such speed has a causal connection with the accident.’
“This principle is again clearly stated in the case of Marler v. State [La.App.], 78 So.2d 26, wherein the Court states:
‘Regardless of his speed, the Marler automobile had reached a point where, so far as the driver was concerned, the collision could no longer be avoided. Such speed, if excessive and exceeding the lawful limit, was only a condition and not a proximate cause of the collision.’
“This Court finds as a matter of fact that there was no convincing evidence in this trial to show excessive speed on the part of Ledet and there was no evidence produced to show that the alleged excessive speed of Ledet was a proximate cause of this accident.
*13 “In essence, this Court finds from all of the evidence presented and from being able to observe the witnesses testify that as a matter of fact, Ledet could not have seen the Parish water truck any sooner than he did and that after observing the said truck Ledet did everything he could to avoid the accident, to-wit, applying his brakes to the fullest. This Court further concludes from all of the testimony with regard to speed, that the Ledet vehicle was traveling approximately 65 m. p. h. and even if the Ledet vehicle was traveling at a speed slightly faster than 65 m. p. h., his speed was not a proximate cause of this accident. Quite candidly, the proximate cause of this accident was the negligent driving of the Parish water truck.
“The Court now addresses itself to the question of damages sustained by the principal plaintiff, Sterling Ledet, and intervenor, Maryland Casualty Company.
“Considering the evidence introduced at the time of trial and stipulations made therein this Court finds that Sterling Ledet suffered uncompensated special damages as of the date of trial as follows:
“Doctor bill of Dr. Sherman $100.00
Automobile Deductible $150.00
Stipulated miscellaneous property damage $100.00
Lost wages not compensated by workman’s compensation as of the date of filing suit $1978.77
TOTAL special damages sustained by Ledet $2328.77
“The Court’s findings as to lost wages if based on the fact that Ledet lost $313.-77 while totally incapacitated from July 31, 1962 to October 2, 1962 which was the amount not covered by workman’s compensation. The Court further finds that while partially disabled from October 3, 1962 to the date of filing suit on June 20, 1963, Ledet lost $45.00 per week or $1,665.00 which was also not covered by workman’s compensation, making a total of $1,978.77.
 “From the stipulations entered into the record, the Court finds that Maryland' Casualty Company paid to Ledet, $1,493.19 in workman’s compensation payments plus $320.73 for medical expenses. Therefore, Maryland is entitled to subrogation in the total amount of $1,813.92 for these medical expenses and workman’s compensation payments made to Ledet.
“As to Ledet’s injuries, this Court is convinced that this young man sustained serious, painful, disfiguring and to some extent, permanently disabling injuries. The record indicates that Ledet spent eleven days in the West Jefferson General Hospital following his accident and for some portion of time he was on the critical list. The record further indicates that he had to be confined to bed for approximately three weeks after his discharge from the hospital and was unable to perform any work for approximately three months after the accident, after which time he could only return to light duty.
“From a medical standpoint, it is clear from the testimony of all of the doctors involved, from Ledet’s testimony and from a review of the hospital records that Ledet suffered multiple and painful injuries.
“The record indicates that he lost three of his front teeth and in addition to this, two other front teeth had to be capped. Dr. Di Leo said that it was his opinion that Ledet’s bridge replacing his teeth would have to be substituted once or possibly twice during his expected lifetime.
“The record further indicates that Ledet suffered fractures of two of his ribs.
*14 “The testimony of Dr. Canale as well as the hospital records show conclusively that Ledet suffered a contusion of the myocardia. Dr. Canale similarly points out that Ledet also suffered a pneu-mothorax of the lung and surgical procedures were necessary to properly drain the chest cavity because of this condition.
“The testimony and evidence further shows that Ledet suffered a brain concussion. From Ledet’s testimony and the testimony of Dr. Sherman as well as the plaintiff’s brother’s testimony, it is clear that Ledet suffered a post concussion syndrome for several months after the accident and that at times he would have spells of dizziness and weakness. The record also indicates that for a considerable period after the accident, Ledet was extremely nervous and in a high state of anxiety especially when having to ride in an automobile.
“The medical reports and doctor reports further show that Ledet suffered a laceration of his left thumb which resulted in approximately 60% loss of flexion of the thumb or a 25% loss of the use of the thumb.
“Medical reports and the Court’s own personal observation clearly demonstrated that Ledet suffered permanent and disfiguring scars about the chin, the lower lip and the left wrist.
“Considering the above facts as revealed by medical reports and expert testimony and the Court’s own observations of Ledet, the Court is of the opinion that Ledet was not exaggerating his injuries and this Court feels that Ledet should be awarded the sum of Fifteen thousand and no/100 ($15,000.00) Dollars for physical pain and suffering and for anticipated future medical expenses in addition to the special damages of $2,328.77.”
For the foregoing reasons, the judgment of the lower court is hereby affirmed.
The defendant is to pay all costs of this proceeding.
Affirmed.

. Sterling Ledet was emancipated by marriage at the time of the trial hereof, and he was thus able to stand in judgment in his own name.

. In addition, the lower court rendered judgment on the exception of no cause of action filed by the Parish of Jefferson which was predicated on the plea of governmental immunity.